*1539*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARC S. KIRSCHNER, solely in his capacity as the Liquidation Trustee of the LE-NATURE'S LIQUIDATION TRUST, <br><br> Plaintiff, <br><br> v. <br><br> WACHOVIA CAPITAL MARKETS, LLC d/b/a WACHOVIA SECURITIES; WACHOVIA BANK, NATIONAL ASSOCIATION; CIT GROUP/EQUIPMENT FINANCING, INC.; KRONES, INC.; KRONES AG; VOLKER KRONSEDER; HEINZ SOMMER; MARSHALL FINANCIAL, INC.; MARSHALL INVESTMENTS CORPORATION; THE POLLINGER COMPANY, INC.; DONALD K. POLLINGER; PAUL POLLINGER; GREGORY J. PODLUCKY; JONATHAN E. PODLUCKY; DAVID E. GETZIK; ROBERT B. LYNN; and ANDREW MURIN, JR., <br><br> Defendants. | ___ Civ. _____ <br><br> **08.1518** |

COMPLAINT AND JURY DEMAND

1672114v6

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................... 1

    A.    Roles Of Podlucky And The Insiders ......................................................... 4

    B.    Role Of Wachovia ........................................................................................ 5

    C.    Roles Of Krones And Pollinger ................................................................ 7

    D.    Roles Of CIT Group And Marshall ........................................................... 9

PARTIES ............................................................................................................................... 10

JURISDICTION AND VENUE ............................................................................................. 12

FACTS ................................................................................................................................... 13

I.    Background ......................................................................................................... 13

II.    Wachovia – Le-Nature's' Trusted Financial Advisor And An Essential Player In The Fraudulent Scheme – Funneled Hundreds Of Millions Of Needless Dollars To Le-Nature's ..................................................................................................... 19

    A.    The Operations Of Le-Nature's – A Failed Enterprise – Were Unreasonably Prolonged Through A Series Of Avoidable Financings ............... 20

        1.    $150 Million Of Unneeded Debt ................................................. 20

        2.    Another $250 Million In Unnecessary Financing ...................... 23

        3.    A $75 Million "Add On" Loan That Le-Nature's Did Not Need ............. 28

    B.    Wachovia Learned That Real World Data Contradicted The Financial Records Fabricated By Podlucky And The Insiders, But It Nonetheless Pushed More Financing Into The Failed Le-Nature's Enterprise ......................... 30

    C.    In 2006, The Fraudulent Scheme Began To Unravel And The Number Of Red Flags Accelerated, But Wachovia Both Ignored The Implications And Assisted Podlucky And The Insiders In Hiding The Truth .................................. 36

        1.    Anomalies In Le-Nature's' Finances And Operations ............... 36

        2.    Lack Of Cash And Unpaid Interest ............................................. 40

        3.    Nonexistent Deposits ................................................................... 41

D. As Le-Nature's Spiraled Towards Collapse And Ruin, Wachovia Piled On Even More Debt And Reduced Its Own Exposure .............................. 42

III. CIT Group, Marshall, Krones And Pollinger Substantially Assisted Podlucky And The Insiders In Siphoning Off And Squandering More Than $110 Million From Equipment Lease Financing .............................. 46

A. Krones And Pollinger Substantially Assisted Podlucky's Scheme To Create False And Nonexistent Equipment Deposits And Divert Equipment Financing Monies .............................. 47

1. Pollinger Falsely Confirms The Existence Of Over $160 Million In Equipment Deposits And Skims Financing Monies For Itself And Le-Nature's .............................. 47

2. Krones Assists Podlucky In Skimming Monies Out Of Equipment Financing And Works To Actively Conceal The Scheme When An Informant Threatens To Reveal It .............................. 48

B. CIT Group And Marshall Substantially Assisted The Scheme Of Podlucky; The Insiders And Krones To Defraud Equipment Financiers For The Phoenix Facility .............................. 51

IV. Throughout Le-Nature's' Needlessly Prolonged Existence, Wachovia Published Endless Misrepresentations Regarding Its Alleged Profitability .............................. 57

A. August 18, 2003 – "Initiation Of Coverage With A Buy" .............................. 57

B. October 3, 2003 – "Maintaining Buy Rating" .............................. 58

C. November 19, 2003 – "Bonds Are Attractive" .............................. 59

D. February 20, 2004 – "Strong Growth Ahead; Maintaining Our Outperform Recommendation" .............................. 59

E. April 19, 2005 – "Maintaining Outperform Rating" .............................. 60

F. August 30, 2005 – "Maintaining Outperform Rating" .............................. 61

G. April 13, 2006 – "Maintaining Outperform Rating" .............................. 61

H. June 6, 2006 – "Q1 Results Ahead Of Our Estimates; Reiterate Outperform" .............................. 62

V. Le-Nature's Innocent Minority Shareholders And Directors .............................. 63

VI. The Fraudulent Scheme Provided No Benefit To Le-Nature's .............................. 64

FIRST CAUSE OF ACTION (Against Podlucky, the Insiders and Wachovia for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))..................................................................................................... 66

SECOND CAUSE OF ACTION (Against Podlucky, the Insiders and Wachovia for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))..................................................................................................... 71

THIRD CAUSE OF ACTION (Against Podlucky, the Insiders, Pollinger and Krones for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))..................................................................................................... 76

FOURTH CAUSE OF ACTION (Against Podlucky, the Insiders, Pollinger and Krones for Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))............................................................................................... 80

FIFTH CAUSE OF ACTION (Against Podlucky, the Insiders and Wachovia for Fraud) .......... 85

SIXTH CAUSE OF ACTION (Against Podlucky, the Insiders and Wachovia for Conspiracy to Commit Fraud) ........................................................................... 88

SEVENTH CAUSE OF ACTION (Against Podlucky, the Insiders, Pollinger and Krones for Fraud) .................................................................................................... 91

EIGHTH CAUSE OF ACTION (Against Podlucky, the Insiders, Pollinger and Krones for Conspiracy to Commit Fraud)...................................................................... 94

NINTH CAUSE OF ACTION (Against Wachovia, CIT Group, Marshall, Krones and Pollinger for Aiding and Abetting Fraud)........................................................ 97

TENTH CAUSE OF ACTION (Against Wachovia for Breach of Fiduciary Duty) ................. 101

ELEVENTH CAUSE OF ACTION (Against Podlucky and the Insiders for Breach of Fiduciary Duty)........................................................................................ 102

TWELFTH CAUSE OF ACTION (Against Wachovia, CIT Group, Marshall, Krones and Pollinger for Aiding and Abetting Breach of Fiduciary Duty) ....................... 104

THIRTEENTH CAUSE OF ACTION (Against Wachovia for Negligence/Negligent Misrepresentation) .................................................................................... 109

FOURTEENTH CAUSE OF ACTION (Against Podlucky for Conversion)............................ 110

FIFTEENTH CAUSE OF ACTION (Against Podlucky for Unjust Enrichment)...................... 111

SIXTEENTH CAUSE OF ACTION (Against Wachovia for Avoidance of Preferential Transfers) ................................................................................................. 112

**SEVENTEENTH CAUSE OF ACTION** (Against Wachovia for Avoidance of Intentional Fraudulent Transfers Under Section 548(a)(1)(a) of the Bankruptcy Code) .................. 113

**EIGHTEENTH CAUSE OF ACTION** (Against Wachovia for Avoidance of Intentional Fraudulent Transfers Under Section 544 of the Bankruptcy Code and Applicable State Law) ..................................................................................................................... 114

**NINETEENTH CAUSE OF ACTION** (Against Wachovia for Avoidance of Constructive Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code) .................. 115

**TWENTIETH CAUSE OF ACTION** (Against Wachovia for Avoidance of Constructive Fraudulent Transfers Under Section 544 of the Bankruptcy Code and Applicable State Law) ..................................................................................................................... 116

**TWENTY-FIRST CAUSE OF ACTION** (Against Wachovia for Recovery of the Preferential Transfers, the Section 548 Intentional Fraudulent Transfers, the Intentional Fraudulent Transfers, the Section 548 Constructive Fraudulent Transfers, and the Constructive Fraudulent Transfers) .................................................... 118

**TWENTY-SECOND CAUSE OF ACTION** (Against CIT Group and Marshall for Avoidance of Intentional Fraudulent Transfers Under Section 548(a)(1)(a) of the Bankruptcy Code) .............................................................................................. 119

**TWENTY-THIRD CAUSE OF ACTION** (Against CIT Group and Marshall for Avoidance of Intentional Fraudulent Transfers Under Section 544 of the Bankruptcy Code and Applicable State Law) ................................................................ 120

**TWENTY-FOURTH CAUSE OF ACTION** (Against CIT Group and Marshall for Avoidance of Constructive Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code) ..................................................................................................... 121

**TWENTY-FIFTH CAUSE OF ACTION** (Against CIT Group and Marshall for Avoidance of Constructive Fraudulent Transfers Under Section 544 of the Bankruptcy Code and Applicable State Law) ................................................................ 122

**TWENTY-SIXTH CAUSE OF ACTION** (Against CIT Group and Marshall for Recovery of the CIT/Marshall Transfers) ..................................................................... 123

**PRAYER FOR RELIEF** ...................................................................................... 123

**JURY DEMAND** .................................................................................................. 126

**TRANSFER SCHEDULE** ..................................................................... EXHIBIT A

Plaintiff Marc S. Kirschner, solely in his capacity as the Liquidation Trustee of the Le-Nature's Liquidation Trust (the "Trustee" or "Plaintiff"), by his attorneys, Stonecipher, Cunningham, Beard & Schmitt, P.C. and Kasowitz, Benson, Torres & Friedman LLP, as and for his complaint against Defendants Wachovia Capital Markets, LLC d/b/a Wachovia Securities ("Wachovia Securities"); Wachovia Bank, National Association ("Wachovia Bank" and with Wachovia Securities, "Wachovia"); CIT Group/Equipment Financing, Inc. ("CIT Group"); Krones, Inc. ("Krones USA"); Krones AG ("Krones AG"); Volker Kronseder ("Kronseder"); Heinz Sommer ("Sommer"; and with Krones US, Krones AG and Kronseder, "Krones"); Marshall Financial, Inc. ("Marshall Financial"); Marshall Investments Corporation ("Marshall Investments" and with Marshall Financial, "Marshall"); The Pollinger Company, Inc. ("TPC"); Donald K. Pollinger ("D.K. Pollinger"); Paul Pollinger ("P. Pollinger;" and with D. K. Pollinger and TPC, "Pollinger"); Gregory J. Podlucky ("Podlucky"); Jonathan E. Podlucky ("J. Podlucky"); David E. Getzik ("Getzik"); Robert B. Lynn ("Lynn"); and Andrew Murin, Jr. ("Murin" and with J. Podlucky, Getzik, and Lynn, the "Insiders"), alleges as follows based on extensive investigations conducted by the Trustee and his counsel and review of, among other things, (a) forensic analyses of Le-Nature's' books and records; (b) filings, documents and testimony produced in Le-Nature's' bankruptcy case in the United States Bankruptcy Court for the Western District of Pennsylvania; (c) the guilty plea of the former Director of Accounting of Le-Nature's, Tammy Andreycak ("Andreycak"); (d) interviews of numerous third parties; and (e) other relevant documents and court filings:

## PRELIMINARY STATEMENT

1.      This is an action for violations of the Racketeering Influenced and Corrupt Organizations Act, fraud, breach of fiduciary duty, aiding and abetting fraud and breach of

fiduciary duty, negligence, conversion, unjust enrichment, preferential transfers and intentional

and constructive fraudulent conveyance arising from the collapse of Le-Nature's, Inc. ("Le-

Nature's" or the "Company"), a beverage manufacturer, bottler, and distributor based in Latrobe,

Pennsylvania. Le-Nature's – a company built on years of fraudulent financial statements –

collapsed in October 2006, years after its fraudulently capitalized operation should have been

shut down and liquidated. As a telling example of the extent of this fraud, in 2002, Le-Nature's

publicly reported net sales of over $135 million; forensic analyses since its collapse have

revealed that its actual net sales were less than $2 million. As another telling example, in 2005,

Le-Nature's reported net sales of over $275 million; actual net sales were less than $49 million.

This gross disparity in reported and actual sales – and the illusion that Le-Nature's was a

legitimate profit-making business when it was not – had continued for years, culminating in Le-

Nature's' ultimate bankruptcy and liquidation. Along the way, Podlucky and the Insiders wasted

hundreds of millions of Le-Nature's' dollars on unnecessary capital expansion projects – and

outright stole tens of millions of additional dollars from Le-Nature's – thereby greatly

diminishing Le-Nature's' assets and incurring massive debt to the detriment of Le-Nature's and

its various stakeholders.

2.      Le-Nature's' failed operations were unreasonably prolonged by an elaborate

fraudulent scheme perpetrated and/or substantially assisted by the defendants to this action. The

scheme – a form of "Ponzi" scheme of constantly raising new money and incurring ever-

increasing debts to refinance investors, thereby cultivating an illusion that a legitimate profit-

making business existed (the "Fraudulent Scheme" or "Scheme") – was carried out by Podlucky

and the Insiders with the substantial and direct assistance of Wachovia, CIT Group, Marshall,

Krones and Pollinger. A steady stream of unnecessary, unwarranted and avoidable borrowings

propped up the operations of Le-Nature's, and allowed Podlucky and the Insiders, among other things, to build enormously expensive manufacturing facilities that Le-Nature's simply did not need. Indeed, the need to cloak the Fraudulent Scheme in secrecy actually required continued capital expenditures, from an unnecessary expansion in Latrobe, to an albatross of a facility in Phoenix, Arizona, to another entirely frivolous plant planned for Jacksonville, Florida, to pipe dreams of facilities in far away places such as Scotland and Germany.

3.      In addition, the defendants' conduct, by causing Le-Nature's to incur debts far beyond its ability repay, enabled Podlucky and/or the Insiders to steal tens of millions of dollars from the Company. Their embezzlement underscored that throughout the Fraudulent Scheme, Podlucky and the Insiders acted outside the course and scope of their employment and totally abandoned Le-Nature's' interests at every turn. Podlucky enriched himself, conferring no benefit on Le-Nature's, which was left destitute and forced into bankruptcy, leaving legitimate creditors with no source of payment.

4.      As a result of the Fraudulent Scheme, Le-Nature's incurred specific and avoidable losses through the continuation of its operations beyond January 1, 2003, when, by virtue of the debt it took on to continue the Fraudulent Scheme, its failed and insolvent enterprise should have been liquidated. The Fraudulent Scheme hid the true financial condition of Le-Nature's which otherwise would have been apparent years before its ultimate collapse. The independent decision makers of Le-Nature's would have been able to avert the subsequent harm and salvage the remaining value of the Company by dissolving it in a timely manner. Instead, Le-Nature's suffered significant damages by being kept afloat with spurious debt, and Plaintiff, as the Trustee of the Le-Nature's Liquidation Trust, brings this action to recover those damages, which are well in excess of $500 million.

3

A.     **Roles Of Podlucky And The Insiders**

5.     Podlucky and the Insiders committed fraud and breached their fiduciary obligations to Le-Nature's by affirmatively engaging in the Fraudulent Scheme or knowingly and in bad faith ignoring (along with Wachovia, Krones, Pollinger, CIT Group and Marshall) the numerous red flags that portended the existence of that Scheme and the ultimate demise of Le-Nature's.  These red flags included, among other things:

(a)     a CEO, Podlucky, who previously had substantial experience as a professional senior accounting auditor, who kept an iron grip on financial reporting and would not even allow his CFO access to the general ledger;

(b)     market data and other credible evidence demonstrating that Le-Nature's' actual sales were far less than reported sales;

(c)     financial statements that inflated inventory by, for example, listing Le-Nature's' tea stockpiles at close to $20 a pound when, in fact, anyone even slightly familiar with the beverage industry (on making the most casual inquiry) knew or should have known that tea sells wholesale at $.50 to $1.50 a pound;

(d)     reported EBITDA (earnings before interest, taxes, depreciation and amortization) margins that were unreasonably high given Le-Nature's' wholesale pricing and the margins of comparable companies;

(e)     Le-Nature's' repeated failures to make interest payments on its bank debt and lease obligations as those payments became due;

(f)     reported sales growth that was nonsensical given the highly competitive nature of the bottled beverage industry;

(g)     numerous violations of basic accounting principles in Le-Nature's' financial statements, including the reporting of hundreds of millions of dollars in capital

4

leases as operating leases and the failure to treat the Phoenix facility as
construction in progress;

(h)     reported wholesale prices that were greater than the retail prices for Le-Nature's'
various beverage products;

(i)     Podlucky's diversion of Le-Nature's' assets for personal use (including, among
other things, millions of dollars of expenditures for his personal residence and an
adjacent structure owned by him personally and known as the "Training Center,"
and his bizarre purchases of tens of millions of dollars in jewelry and model
trains);

(j)     a conspicuous absence of Le-Nature's' product from stores when, according to
Podlucky and the Insiders, the Company's sales were supposedly expanding
rapidly; and

(k)     Podlucky's suspicious habit of pulling out of any proposed sale of Le-Nature's
just as the potential suitor was intensifying its due diligence of Le-Nature's'
operations.

At all relevant times, Podlucky's and the Insiders' conduct was hostile and adverse to the
interests of Le-Nature's, and was motivated solely by greed and self-interest.  Podlucky and the
Insiders completely abandoned Le-Nature's' interests.

B.      Role Of Wachovia

6.      By virtue of its multi-faceted relationship with Le-Nature's, among other things,
as financial advisor, investment bank, underwriter, placement agent, syndicator and lender,
Wachovia owed a fiduciary duty to Le-Nature's and breached that duty by providing substantial
and absolutely essential assistance to the Fraudulent Scheme.  Beginning no later than early
2003, Wachovia knew that Le-Nature's did not have the revenues to finance its reckless

5

expansion and yet it nonetheless chose to push through needless and avoidable financings for Le-Nature's. Throughout the ensuing years, in an effort to strengthen its relationship with Le-Nature's and enrich itself, Wachovia: (a) ignored numerous red flags regarding Le-Nature's' operations and financial condition; (b) participated in the altering of Le-Nature's' financial data; (c) recognized, but remained silent about, Le-Nature's' flawed accounting in its financial statements; (d) allowed knowingly misleading financial data to be circulated to Le-Nature's' creditors; and (e) continued to push additional financing for Le-Nature's even after the Fraudulent Scheme was discovered in late October 2006. In fact, Wachovia's only response to the public disclosure of that Scheme was to try to push through yet another loan.

7.     Wachovia raised over $600 million in capital for Le-Nature's, and did so with false and misleading offering memoranda and pitch materials that continually portrayed Le-Nature's as a vibrant, rapidly expanding company with the wherewithal to pay its debts as they came due. Internally, however, Wachovia questioned Le-Nature's' ability to cover its debts, and the endless inconsistencies in its reported financial data, but comforted itself by noting that Le-Nature's would probably be sold soon. In fact, in the hopes of a quick sale, Wachovia turned a knowingly indifferent eye to the red flags raised by potential purchasers and the odd conduct of Podlucky in repeatedly rejecting purchase offers just as due diligence was heating up.

8.     Wachovia drafted the misleading offering materials for Le-Nature's even though it knew that the Company's growth was "not possible" and "out of control," and that Le-Nature's' reported sales were significantly greater than what independent market data suggested. Nonetheless, Wachovia pushed further financings for Le-Nature's – which it clearly had no ability to repay – in order to build up Wachovia's fledgling high-yield debt business and to garner substantial fees for Wachovia.

6

9.     Through its actions, Wachovia ensured a steady stream of capital to a Company with nowhere near the revenues needed to sustain its debt burden. Without Wachovia's assistance, the Fraudulent Scheme would have ceased long before October 2006. Had the independent decision makers of Le-Nature's known its true financial condition – something Wachovia worked hard to conceal or ignore – they could have blocked further expansion projects, acted to avoid the lending facilities promoted by Wachovia, and shut down and liquidated the operations of Le-Nature's years before its ultimate demise.

10.    Wachovia received significant fees and other payments, amounting to tens of millions of dollars, in return for its support of the Fraudulent Scheme. In addition, immediately prior to Le-Nature's' bankruptcy, Wachovia Bank was the recipient of tens of millions of dollars in preferential or fraudulent transfers as detailed in the Transfer Schedule attached as Exhibit A.

### C.     Roles Of Krones And Pollinger

11.    Krones, (including defendants Krones USA, Krones AG, Sommer, and Kronseder), and Pollinger, (including its principals) substantially assisted the Fraudulent Scheme by supporting Podlucky in his efforts to siphon off over $118 million in financing that was actually meant for itself fraudulently priced equipment being built for the expanded Latrobe, new Phoenix and planned Jacksonville facilities. This siphoned money – referred to as "excess payments" – was supposedly "refunded" to Le-Nature's for deposits that it had purportedly made on the equipment. However, as Krones and Pollinger both knew, those deposits had never been made and did not exist. Thus, when "excess payments" were diverted back to Le-Nature's from the financing received for the manufacturing of equipment, Pollinger and Krones clearly knew that such payments were not refunded deposits.

12.    For example, one of Pollinger's roles was to arrange financing for manufactured equipment from equipment lessors. Podlucky and Pollinger devised a scheme to defraud certain

7

of those lessors for Latrobe by either inflating equipment invoices, using a simple "bait-and-switch" (billing for expensive equipment, then ordering something cheaper) or arranging financing for leasing equipment that was never actually purchased. Under all of these scenarios, the equipment lessors ended up paying Pollinger – the purported "manufacturer's representative" – more than Pollinger had to pay the manufacturer. Pollinger then sent the excess to Le-Nature's. Pollinger acted through its principals D.K. Pollinger and P. Pollinger.

13.     Podlucky, the Insiders and Krones perpetrated a similar scheme to skim monies from the financing for the Phoenix bottling facility. Podlucky and the Insiders sent the Phoenix equipment financiers fraudulently inflated invoices for equipment. When the equipment financiers would then pay Krones more money than it needed to manufacture that equipment, Krones – pursuant to written "excess payment" agreements with Podlucky – sent the excess funds to Le-Nature's. Significantly, when an informant, by telephone calls to Kronseder and other senior officers of Krones and others, threatened to reveal the Phoenix equipment financing scam, Krones, acting through Kronseder and Sommer, and Podlucky worked together to conceal this part of the Fraudulent Scheme, concocting false and misleading schedules of equipment costs as well as baseless explanations for why financing dollars exceeded the actual cost of equipment for the Phoenix plant.

14.     Once construction of the Phoenix facility was completed, Podlucky sought to continue this aspect of the Fraudulent Scheme through the construction of yet another bottling facility in Jacksonville, Florida. If Le-Nature's ever made any equipment deposits, they were a trivial amount and nowhere near the sums that Krones and Pollinger funneled back to Podlucky.

15.     Because of their complicity with Podlucky and the Insiders, Pollinger and Krones substantially assisted the diversion of approximately $118 million in cash to Le-Nature's, which

funds were then used to prolong the existence of an enterprise that any reasonable person understanding its true financial condition, based on the debt it incurred, would have liquidated years before.

**D.    Roles Of CIT Group And Marshall**

16.    CIT Group and Marshall substantially assisted the Fraudulent Scheme by arranging and syndicating over $140 million in "synthetic lease" equipment lease financing for the Phoenix plant, *with full knowledge that Podlucky and the Insiders had probably inflated the projected cost of the equipment to be manufactured for that plant.* Specifically, prior to the closing of the Le-Nature's equipment financing agreement for Phoenix, the same informant who had contacted Krones: (a) disclosed to CIT Group and Marshall that the true cost of the Phoenix equipment was substantially lower than the $184 million contract price, and (b) provided a spreadsheet supporting the allegation. Indeed, in recent court filings, both Marshall and CIT Group have admitted that they were so informed.

17.    Nonetheless, CIT Group and Marshall failed to disclose the informant's allegations to anyone – including the lenders to which they syndicated the Phoenix financing, Le-Nature's' independent decision makers or Le-Nature's' other lenders – and did nothing meaningful to investigate the informant's evidence. Instead, CIT Group and Marshall pushed ahead, reaping significant fees for syndicating equipment financing where almost half the money was not even to be used for equipment. In fact, they did so even though they knew (or knowingly ignored the fact) that the manner in which that financing was structured precluded Le-Nature's from using synthetic lease accounting – *i.e.*, the whole structure of the financing was flawed from its inception.

18.    By engaging in this reckless behavior – and knowingly assisting this significant aspect of the Fraudulent Scheme – CIT Group and Marshall created the possibility of "excess

payments," as discussed above, and aided and abetted the needless flow of cash to Le-Nature's. Indeed, *CIT Group even agreed to the release of those "excess payments,"* thereby knowingly and substantially assisting the Fraudulent Scheme, and overtly contributing to the wasteful dissipation of Le-Nature's' assets.

19.     For these reasons, and as set forth in more detail below, all of the defendants are liable to Le-Nature's for the significant losses incurred by Le-Nature's as a result of their conduct, a sum that exceeds $500 million.

**PARTIES**

20.     Plaintiff is the Trustee of the Le-Nature's Liquidation Trust.  On July 8, 2008, the United States Bankruptcy Court for the Western District of Pennsylvania, which presided over Le-Nature's' bankruptcy – issued an order (the "Confirmation Order") confirming the Second Amended Joint Plan of Liquidation dated April 9, 2008 ("Plan") of Le-Nature's and its affiliates (collectively, "Debtors").  The Le-Nature's Liquidation Trust (the "Liquidation Trust") was created pursuant to the Plan and the Confirmation Order upon effectiveness of the Plan on July 25, 2008.  Under the Plan and related agreements, all the assets and property of the Debtors, including but not limited to all rights, claims, and causes of action possessed by Le-Nature's, were conveyed to, vested in, and retained by the Liquidation Trust, and Plaintiff was appointed as Trustee of the Liquidation Trust.

21.     Le-Nature's is a Delaware corporation which had its principal place of business in Latrobe, Pennsylvania.  At all relevant times, Le-Nature's had substantial operations in Latrobe.

22.     Upon information and belief, defendant Wachovia Securities is a Delaware limited liability company with its principal place of business in North Carolina.

23.     Upon information and belief, defendant Wachovia Bank is a national banking association with its principal place of business in North Carolina.

10

24. Upon information and belief, defendant CIT Group is a Delaware corporation with its principal place of business in New Jersey.

25. Upon information and belief, defendant Krones USA is a Delaware corporation with its principal place of business in Wisconsin. Krones USA is a wholly owned subsidiary of, and the exclusive United States market agent for, Krones AG, and its Franklin, Wisconsin, headquarters is referred to as Krones AG's "United States headquarters."

26. Upon information and belief, defendant Krones AG is a corporation organized under the laws of, and with its principal place of business in, Germany. Krones AG manufactures, among other things, bottling equipment.

27. Upon information and belief, defendant Kronseder is a citizen and resident of Germany and the majority shareholder of Krones AG.

28. Upon information and belief, defendant Sommer is an individual who resides in the Commonwealth of Pennsylvania and is a president of Krones USA.

29. Upon information and belief, defendant Marshall Financial is a Delaware corporation with its principal place of business in Minnesota.

30. Upon information and belief, defendant Marshall Investments is a Delaware corporation with its principal place of business in Minnesota.

31. Upon information and belief, defendant TPC is a Delaware corporation with its principal place of business in North Carolina.

32. Upon information and belief, defendant D.K. Pollinger is an individual who resides in the State of North Carolina and is a principal of TPC.

33. Upon information and belief, defendant P. Pollinger is an individual who resides in the State of North Carolina and is a principal of TPC.

11

34.     Upon information and belief, defendant Podlucky is an individual who resides in the Commonwealth of Pennsylvania.  At all times relevant hereto, he was the majority and controlling shareholder of Le-Nature's and its Chief Executive Officer and the Chairman of its Board of Directors (the "Board").

35.     Upon information and belief, defendant J. Podlucky, the brother of Podlucky, is an individual who resides in the Commonwealth of Pennsylvania.  At times relevant hereto, he was the Chief Operating Officer of Le-Nature's and was Podlucky's nominee to and a member of the Board.

36.     Upon information and belief, defendant Getzik is an individual who resides in the Commonwealth of Pennsylvania.  At times relevant hereto, he was the Chief Financial Officer of Le-Nature's and was Podlucky's nominee to and a member of the Board.

37.     Upon information and belief, defendant Lynn is an individual who resides in the Commonwealth of Pennsylvania.  At times relevant hereto, he was an Executive Vice President of Le-Nature's and was Podlucky's nominee to and a member of the Board.

38.     Upon information and belief, defendant Murin is an individual who resides in the Commonwealth of Pennsylvania.  At times relevant hereto, he was Podlucky's nominee to and a member of the Board.

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over all claims raised in this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 1367.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

41.     All of the defendants:  (a) are registered to do business in or otherwise have a

presence in the Commonwealth of Pennsylvania, or (b) with respect to the causes of action

asserted herein, acted directly or by an agent to:  (i) transact business in Pennsylvania, (ii) engage

in a business or profession within Pennsylvania, or contract to supply services or things in

Pennsylvania; (iii) cause harm or tortious injury by an act or omission in Pennsylvania; and/or

(iv) cause harm or tortious injury in Pennsylvania by an act or omission outside of Pennsylvania.

42 Pa. C.S. § 5322.

## FACTS

## I.     __Background__

42.     Le-Nature's (f/k/a Genesis, Inc. and Global Beverage Systems, Inc.) was founded

by Podlucky in 1992 and produced its first product, a carbonated flavored water called Sparkler,

that year.  By 1993, the Company expanded its line of products to include iced teas, lemonades

and a juice-based line of drinks called Dazzlers.  By 2005, the Company claimed to be producing

nearly 60 different non-carbonated beverage products.

43.     Le-Nature's styled itself as a low cost innovator in the bottled beverage industry

and touted its alleged use of cutting-edge technologies and distribution methods.  In the 1990s,

Le-Nature's purported to be one of the first beverage companies to move its products into

environmentally safer "PET" (polyethylene terephthalate) plastic bottles, to patent a method by

which beverages could be pasteurized in the bottle itself, and to develop new technologies for

brewing iced tea.  In fact, Le-Nature's described itself as having one of America's most

advanced beverage manufacturing facilities.

44.     According to its annual financial statements, public pronouncements and

marketing materials, Le-Nature's was a remarkably successful company.  The growth in the

variety of beverage products it sold purportedly spurred even more impressive growth in its gross

13

sales, net sales and profits. The 2002-2005 year-to-year reported increases in Le-Nature's' sales were as follows:

| Year | Reported Gross Sales | Reported Net Sales |
|------|----------------------|--------------------|
| 2002 | $143,766,705 | $135,650,095 |
| 2003 | $179,905,164 | $155,746,687 |
| 2004 | $228,812,363 | $207,069,179 |
| 2005 | $287,233,880 | $275,089,169 |

45.    Disturbingly, however, actual sales were approximately:

| Year | Actual Gross Sales | Actual Net Sales |
|------|--------------------|------------------|
| 2002 | $2,202,449.32 | $1,681,852.27 |
| 2003 | $13,264,385.20 | $7,917,924.03 |
| 2004 | $41,723,034.66 | $12,929,541.62 |
| 2005 | $64,408,078.82 | $27,367,939.30 |
| 2006 | $80,292,256.89 | $48,949,296.86 |

46.    The gross disparity between reported and actual sales is stunning and lies at the heart of the Fraudulent Scheme. Among other things, as a result of that Scheme, Le-Nature's built – and in 2005 commenced operations at – what turned out to be a completely unnecessary 500,000 square foot, state-of-the-art facility in Phoenix, Arizona. The new facility substantially expanded Le-Nature's' production capacity, enabling it (according to the Company) to produce 32 million more cases of beverages per year. As Le-Nature's and Wachovia representatives stated in one presentation to lenders, by December 2005, Le-Nature's had "expanded from 1 production facility with a total of 2 lines in 2003, to currently 2 production facilities with a total of 7 lines in operation."

47.    Despite the needless and enormous expenditures made in Phoenix, Podlucky and the Insiders – in order to attract new capital and continue the Fraudulent Scheme – immediately started plans for a Jacksonville, Florida facility and spoke of additional facilities throughout the United States and Europe.

48.     The glowing Le-Nature's financial information, as well as the news of expanded production capacity and plans for additional facilities, falsely painted the picture of a booming company when, in fact, Le-Nature's was strapped for cash and teetering on collapse. In May 2006, frustrated with Podlucky's reckless expansion efforts, minority preferred shareholders of Le-Nature's (who were represented by independent directors on the Board) initiated an action in Delaware Chancery Court against Le-Nature's and four of its inside directors (Podlucky, J. Podlucky, Murin and Lynn) (the "Delaware Action"). In June 2006, the Chancery Court entered a preliminary injunction restraining the Company from taking certain steps, such as making capital expenditures outside the ordinary course of business (amounts in excess of $1,000) without the minority shareholders' approval.

49.     In October 2006, the Company's preferred shareholders were advised that, through the use of forged documents, Podlucky had converted funds placed on deposit by one of its equipment lessors. Specifically, AIG Commercial Equipment Finance, Inc. ("AIG") had agreed to provide equipment lease financing for production lines at the planned Florida facility. To that end, in late 2005 and early 2006, AIG deposited approximately $26 million with Krones. When AIG sent a representative to the Krones AG plant in Germany to inspect the equipment, it learned that manufacturing had barely begun and that Krones had transferred nearly $20 million of AIG's deposit to Le-Nature's, supposedly based on written instructions from AIG. Having given no such instruction, AIG asked for copies of the relevant documents. Among other documents, Krones produced a letter, purportedly written on AIG letterhead and purportedly signed by an AIG representative, authorizing release of funds – *i.e.*, "excess payments" – to Le-Nature's. According to AIG, the letter was a forgery, and AIG obtained an expert opinion attesting to the letter's falsification.

50.     Following revelation of the forgery, on October 20, 2006, the Delaware Chancery Court issued a temporary restraining order ("TRO"), and on October 27, the Court approved the preferred shareholders' request for the appointment of a custodian and appointed Kroll Zolfo Cooper ("KZC") as custodian for Le-Nature's.  KZC took possession and control of the Company that same day at 5:30 p.m.  Over the next few days, several Company employees informed KZC that they had witnessed individuals, including Podlucky, shredding documents. KZC also was advised that over the weekend of October 21 and 22, 2006, a dump truck arrived at the Company and unloaded a large volume of documents into the trash compactor, and that several employees witnessed Podlucky's personal bodyguard depositing various bundles of documents into the compactor.  Further, an accounting employee advised KZC that false entries were made in order to meet revenue targets and that the 2005 audited financial statements were based on falsified information.

51.     On November 1, 2006, Steven G. Panagos, a KZC managing director, filed an affidavit with the Delaware Chancery Court detailing the significant financial discrepancies at Le-Nature's.  Subsequent forensic investigation has confirmed that revenues, accounts receivable, sales and inventories, among other items, were grossly inflated in Le-Nature's' financial statements, and that numerous documents were forged and/or fabricated to support these misleading numbers.  For example, in 2003, net sales were overstated by a factor of 19, accounts receivable were overstated by a factor of at least 3, and tea inventories were overstated by a factor of at least 30.

52.     Also on November 1, 2006, several of Le-Nature's' creditors initiated involuntary bankruptcy proceedings under the United States Bankruptcy Code.  Almost immediately, Le-Nature's ceased operations at its Phoenix facility.  On November 13, 2006, employees who

16

reported to work at the Latrobe facility were sent home and told that the plant would be temporarily closed. Production never resumed.

53.    Since initiation of the bankruptcy proceedings, first, a Chapter 11 trustee, and now the Trustee, together with their consultants and advisors, have conducted an intensive investigation regarding Le-Nature's' actual operations and financial performance during the years 2002 through 2006. The investigation, which is ongoing, has revealed a massive fraud (*i.e.*, the Fraudulent Scheme) at Le-Nature's. Le-Nature's' constant efforts to raise capital – which was supposed to generate funds to expand Le-Nature's' production and distribution lines – actually were undertaken to finance and unreasonably prolong the slumping operations of a company that never successfully broke into the bottled beverage industry.

54.    For example, investigators have shockingly discovered two separate accounting systems at Le-Nature's. One (a Navision program) tracked Le-Nature's' actual sales, actual accounts payables (for checks only), and inventory and shipments information for product actually sold, while the other (ironically, called a Real World program) contained primarily fraudulent numbers. This was a textbook example of a company maintaining two sets of books to conceal a fraud.

55.    Only Podlucky and one additional Le-Nature's employee, Andreycak, the former Director of Accounting, had access to the Real World database. Bank statements and invoices, among other documents, were forged or fabricated to support the false and misleading data input into the fraudulent Real World database. Accordingly, each of the annual and quarterly financial statements for Le-Nature's from at least 2002 through 2006 was false and misleading, containing grossly inflated revenues, sales, assets and inventory figures, among others. Further, each of Podlucky, J. Podlucky, Lynn, Murin and Getzik were involved in the preparation of false

17

financial data and were individually responsible for the fact that Le-Nature's regularly disseminated false and misleading financial statements.

56.    And most bizarrely, a secret room was discovered at the Latrobe facility. In that room were safes containing over 845 individually purchased items of jewelry, including an extremely rare red and green diamond. Podlucky purchased that jewelry from such renowned jewelers as Van Cleef & Arpels, Inc., Harry Winston and Bvlgari with over $30 million of monies embezzled from Le-Nature's. And, that was not the only embezzlement which took place: Podlucky also purchased approximately 8,000 Lionel model trains (which were not even removed from the shipping boxes) that he paid for with Le-Nature's' money. In addition, Podlucky was building an enormous structure, dubbed the "Training Center," which was also financed with, at least in part, monies from Le-Nature's. Finally, there is evidence that some Le-Nature's funds were transferred to Podlucky to build a huge mansion for his personal residence and other funds were transferred to him and then distributed to his wife and son.

57.    The reality of the Fraudulent Scheme was made all too apparent when, in or about April 2008, Andreycak pleaded guilty to four felony counts of bank fraud, wire fraud, conspiracy and falsifying income tax returns. The counts to which Andreycak pleaded guilty underscored the role played by Podlucky, J. Podlucky, Lynn and Murin in the Fraudulent Scheme.

58.    Upon information and belief, Le-Nature's was insolvent by, and should have liquidated no later than, January 1, 2003. Such a liquidation would have avoided the several financings promoted by Wachovia, the numerous equipment lease obligations involving Podlucky, the Insiders, CIT Group, Marshall, Krones and Pollinger, and Podlucky's theft of funds. However, because of the Fraudulent Scheme, the independent decision makers of Le-Nature's did not learn of Le-Nature's' actual financial condition until late in 2006. By then, Le-

18

Nature's' assets had been greatly and needlessly diminished, and the Company was saddled with debts it had no ability to repay.

**II.     Wachovia – Le-Nature's' Trusted Financial Advisor And
An Essential Player In The Fraudulent Scheme – Funneled
Hundreds Of Millions Of Needless Dollars To Le-Nature's**

59.     Wachovia was a key participant in the Fraudulent Scheme, constantly assisting Le-Nature's in raising capital, paying down capital, and then raising more capital, and thereby creating the illusion that Le-Nature's was a financially viable entity when it was not.  Through these needless financings, Wachovia earned tens of millions of dollars in fees, and propped up its fledgling high yield practice.

60.     In or about 2003, Le-Nature's commenced what would become a multi-year relationship with Wachovia, during which time Wachovia would serve as the exclusive financial advisor to, placement agent and investment banker for, Le-Nature's.  In this role, Wachovia was responsible for arranging, funding, syndicating and selling an array of credit facilities, all to raise more money to fund Le-Nature's' purportedly expanding but illusory production and sales. During the course of this relationship, Wachovia obtained significant access to, and knowledge of, the Company's operations and financial condition and – as a result – was fully aware of numerous red flags demonstrating that Le-Nature's' operations and finances were not as reported.

61.     Despite having this knowledge, Wachovia did nothing, and moved aggressively to issue more debt and provide more needless capital to an enterprise that could not sustain itself. In fact, Wachovia went so far as to actually assist Podlucky and the Insiders in constructing excuses for how Le-Nature's' reported financial data was somehow consistent with contrary real world observations.  In the end, Wachovia knew of, or knowingly ignored, the Fraudulent Scheme, and substantially assisted the perpetration of that Scheme until October 2006.

A.    **The Operations Of Le-Nature's – A Failed Enterprise – Were**
      **Unreasonably Prolonged Through A Series Of Avoidable Financings**

1.    **$150 Million Of Unneeded Debt**

62.    In or about 2003, Marshall introduced Wachovia to Podlucky, and Podlucky

subsequently hired Grant Rice of Wachovia Securities ("Rice"), a former Bank of America Corp.

investment banker with ties to Le-Nature's. Thereafter, Wachovia quickly moved to seize Le-

Nature's as a client and, in April 2003, Wachovia, with Marshall as co-syndicator, arranged the

first in a series of needless and wasteful credit facilities, this one for $150 million (the "April

2003 Facility").

63.    Prior to the closing on that April 2003 Facility, Wachovia already knew that Le-

Nature's was a troubled company that would need continued borrowings to sustain itself. For

example, in a February 2003 e-mail, Susan Storm of Wachovia Securities ("Storm"), recognized

that one of the risks of the Facility was the Company's "aggressive growth" and that "[e]xisting

earnings would not be adequate to support debt taken on to build t[he] new [PET] plant." The

new PET plant was a reckless and expensive addition to the Latrobe facility for the

manufacturing of plastic bottles; given that Le-Nature's was a beverage company and, thus,

management "ha[d] no experience in PET manufacturing," this expenditure was senseless in that

in Wachovia's experience with similar facilities, "some delay was inevitable and expense is

generally higher."

64.    Storm also admitted that additional risks of the deal were that "part of the purpose

of the proposed facility was to rationalize the capital structure of the company" and "[f]inancial

management was not as strong as we would like." In short, Wachovia knew, and conceded in

internal communications, that the bank loan it was constructing for Le-Nature's was meant to

clean up an otherwise convoluted capital structure that was backed by questionable management.

20

65.     Clearly worried about Le-Nature's financial integrity, Wachovia Securities

retained Boston & Associates, P.C. ("B&A"), an accounting firm, to conduct an audit of Le-

Nature's' financial records.  In a report issued in March 2003 – a report apparently never

communicated to anyone outside of Wachovia – B&A documented numerous red flags regarding

Le-Nature's' financial records and the integrity of management:

(a)     In response to B&A's information requests, only a "banker's box" of documents

        were provided which reflected only "some of the information that was requested";

(b)     one folder in that box, titled "credit memos," contained a sheet of paper that

        disturbingly stated that "no monthly credit memos for the period from January

        2002 to January 2003 had been issued";

(c)     B&A was not allowed to ask "various operational, accounts receivable and

        accounts payable" questions of the individuals who performed those tasks, and

        was told instead that it would be provided with "memos" by Podlucky purportedly

        addressing accounting procedures;

(d)     B&A was told that only Podlucky could answer some of its questions, but

        Podlucky refused to meet with B&A and, instead, provided answers to written

        questions that were supported only with "limited documentation";[1]

(e)     Invoices and bills of lading were mysteriously undated and "[w]ithout dating,

        [B&A was] unable to determine if the invoice [was] prebilled or delayed";

---

[1]     The B&A report states: "We approached Greg [Podlucky] to find a time that he would be available to discuss the inventory questions. He stated that he did not set aside management time for our examination and that other auditors would just take the information provided and review the numbers. He then asked if this was a management audit. We stated that it is our standard procedure to discuss our questions with the people who perform the specific job functions and that we attempt to obtain an understanding of the company and its policies and procedures. We were told to write down specific questions and that the questions would be answered. We provided Le-Nature with a list of questions and our questionnaires to be completed. Le-Nature (Greg) answered the questions and completed our questionnaires, but mostly with limited documentation (sometimes a yes or no answer)."

(f)     B&A was unable to trace alleged payments on invoices to "original source documents, *i.e.,* customer check or remittance" because Le-Nature's claimed, incredibly, that it chose not to receive such documentation from its banks;

(g)     accordingly, "Le-Nature's current cash system [did] not allow auditors the ability to trace customer payments . . . ;"

(h)     Le-Nature's' personnel were unaware of its "current cash position";

(i)     B&A's review of outstanding checks revealed some that were four months old, and yet still had not been presented for payment, and Le-Nature's personnel claimed ignorance as to why;

(j)     B&A requested, but did not receive, "customer purchase orders";

(k)     Le-Nature's' outstanding check listing on accounts payable did not "provide the vendors name or the date of the check";

(l)     Le-Nature's' accounts payable had mysteriously increased 621 percent from January 2002 to December 2002; and

(m)     Le-Nature's was "late in making several federal tax deposits during 2002."

66.     In one particularly egregious incident of non-cooperation, B&A was completely stymied in its effort to conduct a "credit memo" test on Le-Nature's:

> We selected twelve (12) credits totaling $6,096M and requested the supporting documentation for the credits. We requested the credit memo and supporting documentation, reason for the credit, invoice that the credit refers to, and if the invoice was rebilled, the new invoice. *We were not provided with any of the information we requested.* (Emphasis added)

67.     Nonetheless, B&A's troubling report was all but ignored by Wachovia, and one month later, the April 2003 Facility was closed. In connection with that Facility, Wachovia Securities and Le-Nature's distributed a Confidential Information Memorandum to potential lenders to the facility. Among other things, the Memorandum made specific representations

regarding Le-Nature's net sales, compound annual growth, EBITDA, EBITDA margin, and accounts receivable. For instance, the Memorandum represented that:

- From 1998 to 2002, Le-Nature's' net sales grew from $19.2 million to $135.7 million reflecting a compound annual growth rate of 63.1%;

- For the twelve months ending December 31, 2002, Le-Nature's generated estimated net sales of $135.651 million reflecting growth of 66% over the previous year;

- For 2002, Le-Nature's adjusted EBITDA increased from $6.5 million to $50.3 million with an adjusted EBITDA margin of 37.1%, "one of its highest levels in the past five years;" and

- As of December 31, 2002, Le-Nature's total accounts receivable was $16.8 million, or 44.5 days net sales for 2002.

Thus, while the Memorandum represented Le-Nature's' net sales as robust, these numbers were completely fictitious. In reality, actual net sales for 2002 were only approximately $1.66 million.

68.     As an example of how much Wachovia downplayed the B&A report, Wachovia's internal risk assessment made only the following passing reference to the numerous red flags identified by B&A: "[a] collateral field performed by Paul Boston & Associates did identify continued need for further growth within the financial management team, particularly w/ regards to management of the A/R and DDA processes." Clearly, B&A's report identified many additional problems, including unverifiable customer payments and cash positions, undated invoices and bills of lading, and a complete lack of management cooperation.

2.      **Another $250 Million In Unnecessary Financing**

69.     Soon after the April 2003 Facility closed, Wachovia began working on an offering of Le-Nature's notes ("Notes") that was meant to replace the April 2003 Facility (the "Note Offering"). However, internal dissension at Wachovia was brewing.

23

70.     In May 2003, Wachovia's High-Yield Capital Markets Division (the "Origination Division"), which acted as an investment bank charged with originating and underwriting investment opportunities, approached its publicly trading counterpart, the High-Yield Sales (Trading and Research) Division (the "Sales Division"), with the new Le-Nature's transaction. On information and belief, within Wachovia, the Sales Division expressed misgivings about the Note Offering, specifically questioning the accuracy of Le-Nature's' recent sales trajectory. Moreover, a senior Wachovia executive warned at the time that the Company "had hair on it" – a colloquial term indicating challenges at Le-Nature's. As one former member of the Sales Division acknowledged, the Sales Division was very concerned about moving forward with the transaction and hoped that it would simply "go away."

71.     In light of its concerns, the Sales Division advised the Origination Division that, based on its review of the Note Offering, it believed additional due diligence was needed. Tellingly, in May 2003, Podlucky pushed back on due diligence requests and even briefly placed the transaction on "HOLD indefinitely." Wachovia just ignored this odd and overly defensive behavior. And the Origination Division – determined to complete the Note Offering and further cement Wachovia's relationship with Le-Nature's – advised the Sales Division simply to trust the Origination Division's due diligence and move forward in selling the Notes.

72.     In June 2003, Wachovia arranged the issuance and placement, and acted as the underwriter, of the $150 million Note Offering. The proceeds of the Note Offering were used to satisfy Le-Nature's' obligations under the April 2003 Facility.

73.     Wachovia marketed the Notes to investors through: (a) a detailed Offering Memorandum bearing the "Wachovia Securities" name on its cover, (b) in-person "road show" presentations along with Le-Nature's management, and (c) telephone conferences, direct phone

calls, and e-mails to investors.  These various communications contained numerous

misrepresentations about the operations and financial performance of Le-Nature's.

      74.      Among multiple other misstatements, the June 2003 Offering Memorandum

included the following materially false and misleading statements:

- From 1998 to 2003, net sales grew at a compounded annual growth rate of 63.1%.  For the twelve months ended March 31, 2003, the Company generated net sales and EBITDA of $145.0 million and $55.2 million, respectively, resulting in an EBITDA margin of 38.1%;

- Net sales grew from $19.2 million in 1998 to $135.7 million in 2002;

- Le-Nature's' gross sales for 2000, 2001, and 2002 were, respectively, $40,658 million, $85,094 million, and $143,767 million;

- Gross sales increased 41.2% from the first three months of 2002 to the first three months of 2003.  The increase was attributed to (i) a 96.3% increase in case sales of bottled products (an increase of 2.2 million cases sold to 4.5 million cases sold in the first quarter of 2003) and (ii) a 14.0% increase in sales of tea concentrate and blended tea leaves to industrial customers;

- Gross sales for the year ended December 31, 2002 increased by $58.7 million, or 69%, to $143.8 million, as compared to $85.1 million for the year ended December 31, 2001.  The increase in gross sales was attributed to (i) a 46.7% increase in sales of tea concentrate and blended tea leaves to industrial customers and (ii) a 90.3% increase in case sales of bottled products (an increase of 8.4 million cases sold to 17.8 million cases sold in 2002);

- Gross sales for the year ended December 31, 2001 increased by $44.4, million, or approximately 109.3%, to $85.1 million, as compared to $40.7 million for the year ended December 31, 2000;

- Le-Nature's had $6.307 million and $5.136 million deposited with its tealeaf supplier at the end of 2001 and 2002, respectively; and

- For the twelve-month period ended March 31, 2003, gross sales of bulk tea concentrate were $31.5 million, representing 20.5% of total gross sales.  During the same period, gross sales of packaged

bulk tea leaves were $23.7 million, representing 15.4% of total gross sales.

75.     Given Le-Nature's' actual sales and bulk tea transactions for the years 2000-2002, all of the information set forth above was materially incorrect and misleading when it was distributed to investors. As just one example, in 2002, Le-Nature's actual gross sales *were only approximately $2.2 million,* not the $143.8 million reported in the Offering Memorandum. Le-Nature's was a company that, operationally, was about one seventieth of what it reported itself to be. Wachovia knew, or knowingly ignored, the red flags evidencing this fact.

76.     In addition to the Note Offering, Wachovia arranged a replacement $100 million credit facility in June 2003 (the "June 2003 Facility"). Wachovia Securities was the sole lead arranger and bookrunner and, once again, Wachovia Bank served as administrative agent for a fee. Wachovia syndicated the June 2003 Facility – which consisted of a $100 million revolving line of credit senior to the Notes – to multiple lenders. In all, Wachovia earned approximately $7 million in fees from the June 2003 Facility and Note Offering.

77.     In an e-mail dated July 1, 2003, Wachovia's bankers congratulated themselves on their close relationship with Le-Nature's' management, and celebrated the fees and publicity generated by that relationship. The e-mail highlighted Wachovia's ability to knowingly ignore "internal issues" – such as the integrity and due diligence concerns raised by B&A and Wachovia Securities' Sales Division – in order to achieve such results:

> . . . . The recent transaction is receiving a lot of publicity here in Charlotte and everyone is aware that the recent bank/bond deal would not have happened without our prior support of the company via the previous bank deal and the rapport developed with management in the process. . . . As a result of your ability to adapt to an *ever-changing deal* and willingness to work in concert with CIB [a division within Wachovia], we have recognized *total fees of nearly $7.5MM* between the two bank deals and the high yield issuance. *This deal has become a poster child for what we can get done when we don't get hung up on internal issues* and do what is best for the client and our firm as a whole.

26

(Emphasis added)

78.      On August 14, 2003, shortly after Wachovia completed the Note Offering and

June 2003 Facility, John Higbee, Le-Nature's' Chief Financial Officer, abruptly resigned.

Higbee was a veteran auditor – with more than 20 years of experience as an audit partner at

Arthur Andersen – and Wachovia recognized internally that his hiring strengthened Le-Nature's'

financial management team. At about the same time, Jennifer Fabry, the Company's Chief

Administrative Officer (who had recently been given the title of Chief Financial Officer in

Higbee's place), and Stacy Juchno, the Vice President of Administration, also submitted their

resignations.

79.      Higbee's resignation once again stirred internal dissension at Wachovia. As one

former member of Wachovia's Sales Division explained, "it is always pretty horrifying when a

chief financial officer leaves for no reason, making this a very scary event." Because the

Origination Division (and, in particular, Rice) had the closest relationship with Le-Nature's, the

Sales Division sought its assistance to obtain the best information concerning Higbee's

resignation. But when the Sales Division questioned the bankers in the Origination Division

about the departure, it was, once again, told simply to "trust" Origination's view that the chief

financial officer's departure was being adequately handled by the Company. Astoundingly,

Wachovia would not provide its own salespeople with further information that was already in

Wachovia's possession and easily within its ability to obtain from Le-Nature's.

80.      Following the resignations, Wachovia continued to work closely with Podlucky

and the Insiders to raise money for Le-Nature's. In so doing, Wachovia knowingly ignored the

"very scary event" – Higbee's departure – acknowledged by its own banker, even though the red

flags continued unabated. As just one example, Wachovia notes from the fourth quarter of 2003

highlight concerns that: (a) "proper controls [were] not [in] place" at Le-Nature's, (b) a "material weakness" existed because Le-Nature's' "A/P [accounts payable] controller" also "approved credit and payments," and (c) it was "doubtful" that Le-Nature's accounts payable were "zero." While Podlucky and the Insiders were "cooking the books," Wachovia saw the resulting anomalies, and yet did nothing in response.

### 3. A $75 Million "Add On" Loan That Le-Nature's Did Not Need

81. In May 2004, Wachovia arranged and marketed another $75 million loan facility for Le-Nature's that was added to the pre-existing $100 million revolver (the "May 2004 Facility"). Only days earlier, in late April 2004, David Felty of Wachovia Securities ("Felty") wrote that he was "confused" by Podlucky's projections:

* combined water and unflavored water=$188.3MM in 2003, projected to decline to $92.5MM in 2004 (20% decline)? and then increase to $155MM in 2005?

* significant increase in juices from $11.3MM in 2003 to 81MM in 2004?

Podlucky's response was as disturbing as it was baseless: "[t]hese questions are proprietary and are not relevant to an investor."

82. Wachovia, however, was focused on the value it was receiving from the new May 2004 Facility, not inconsistencies in Le-Nature's' financial records. In addition to the usual fees, communications prior to the closing of the May 2004 Facility showed an internal Wachovia debate over whether Wachovia should take a small piece ($5 million) of that loan. In deciding to do so, Wachovia revealed its "exit strategy" for what it knew was a troubled company:

> Another consideration is the fact that Le-Nature's has a definitive exit strategy, in which it plans to be sold in the next 12-18 months. According to management, we will be asked to start the sale process in late 2004 with a Confidential Information Memorandum. . . . Although we can not underwrite [] the sale, we can make some additional income in the short term by participating in the Term Loan B with the expectation that the loan will likely not run its full term.

Wachovia saw Le-Nature's as a short-term risk, and therefore knowingly disregarded the numerous warning signs of Podlucky and the Insiders' long-term deception. Indicative of this push for profits, not the truth, was Wachovia's internal risk assessment for the May 2004 Facility, in which it whitewashed the resignations of Higbee and Fabry by misrepresenting that they had been "let go" by Le-Nature's.

83.    In connection with the May 2004 Facility, Wachovia Securities prepared a Confidential Information Memorandum that it distributed to potential lenders, which touted Le-Nature's' purported net sales from 1999 through 2003: $28 million in 1999, $40 million in 2000, $84 million in 2001, $135 million in 2002, and $159 million in 2003. These figures grossly overstated actual sales and were materially false. As forensic investigation has revealed, Le-Nature's' net sales in 2002 were less than $2 million, and in 2003 less than $9 million. Wachovia Securities' Memorandum further stated that the Company's 2003 EBITDA was $61.1 million, reflecting a compound annual growth rate of 55% since 1999. These numbers also were false and without any basis in reality.

84.    In addition, on April 20, 2004, Wachovia and Le-Nature's made a presentation in New York City to potential lenders with respect to the May 2004 Facility. The cover slide for the presentation showed that "Wachovia Securities" was its author. Jerry Hullinger, a Wachovia Securities director ("Hullinger"), initiated the presentation by providing a "Transaction Overview." He was accompanied by several Le-Nature's executives, including Podlucky, Getzik (then CFO), and Lynn (Executive Vice President), who reiterated the financial results set forth in the Wachovia marketing materials. Following this presentation, Ted Swimmer, a Wachovia Securities managing director ("Swimmer"), provided a "Syndication Overview" in which he

discussed the logistics of the loan and its anticipated closing. The financial information

presented by Wachovia and Le-Nature's was materially flawed and misleading.

**B.**   **Wachovia Learned That Real World Data Contradicted**
        **The Financial Records Fabricated By Podlucky And**
        **The Insiders, But It Nonetheless Pushed More**
        **Financing Into The Failed Le-Nature's Enterprise**

85.   Red flags at Le-Nature's continued throughout 2004. For example, in July 2004,

Wachovia Securities analyst Bryan Hunt ("Hunt") queried Podlucky about the fact that

"ShopRite had Dazzlers for $0.99 per 8-pack" – a price significantly below Le-Nature's

wholesale and discounted wholesale price. With revenues supposedly accelerating, why were

Le-Nature's beverage products being sold by its retail customers for virtually nothing?

86.   Most disturbingly, in September 2004, Podlucky made a bizarre request of Felty

of Wachovia Securities regarding the purported deposits that formed an essential component of

Le-Nature's' capital expansion program:

> I spoke with Greg Podlucky today – he wants a change to his credit agreement to
> allow for them to net deposits outstanding for equipment purchases (that will be
> returned now that the equipment will be financed via operating leases) against
> outstanding debt for covenant purposes – sounds like he has a liquidity need or a
> covenant issue, but he claimed he wanted to do it to show lower leverage on the
> company in their attempts to get upgraded by the ratings agencies.

Of course, as Felty recognizes later in his email, if the deposits were coming back to Le-Nature's

for completed equipment (and by late 2004 they should have been) there was no reason for such

a netting. Thus, anyone paying attention would have immediately recognized the substantial

possibility that, as explained in more detail below, *there were no actual deposits.* Apparently,

Wachovia did nothing to follow up on this strange request.

87.   In fact, internal Wachovia documents demonstrate that it fully understood that

Podlucky's entire capital expansion program – with over $160 million in reported deposits that

never existed – made no sense. For example, construction of the Arizona facility was

supposedly driven by synthetic lease accounting.  Synthetic leasing allows an enterprise to keep assets under construction (*e.g.*, a manufacturing facility) off of its balance sheet because, according to complex accounting rules, the constructed asset is deemed to belong to the financial institutions that are financing the construction.  For example, if CIT Group was financing certain equipment for the Phoenix facility, under synthetic financing rules, CIT Group, and not Le-Nature's, is viewed as the owner of that equipment for accounting purposes.

88.  Not surprisingly, synthetic lease accounting rules are strict, and require that the lessee (here, Le-Nature's) engage in no conduct which can be construed as "taking ownership" of the constructed asset.  Tellingly, an undated memo bearing Wachovia's name recognizes that such synthetic lease accounting was not applicable to Le-Nature's because of contractual and financial obligations it had to the equipment manufacturers, which included the deposits.  The memorandum concludes: "[a]bsent additional information, it appears that [Le-Nature's] should have recognized the assets as construction in progress [on its balance sheet] and accounted for the subsequent lease arrangement as a sale-leaseback upon construction completion."  Wachovia disseminated Le-Nature's' financial statements for years without ever raising the need for changing the manner in which Le-Nature's accounted for its construction projects, and it certainly never informed anyone that Le-Nature's' accounting practices were faulty.

89.  By 2005, Podlucky's behavior was becoming hostile and bizarre.  A June 9, 2005 request from Hunt, the Wachovia Securities analyst, for "sales and volume data for Q4 2004 and Q1 2005" was met with a curt "not available."  Similarly, when Hunt contacted Podlucky two weeks later, on June 23, and asked if Podlucky would be available to discuss Le-Nature's' "current debt level and senior leverage covenant," Podlucky replied: "I am on vacation until July

15, 2005. Please do not bother anyone else." Podlucky was creating a three-week delay on an

issue as simple as current debt, and yet this significant red flag was ignored.

      90.     Continuing his pattern of secrecy and deception, in August 2005, Podlucky denied

a request from Nestle, a potential acquirer of Le-Nature's, for additional due diligence

information. On August 17, Hunt wrote Podlucky, inquiring as to how sales were doing at

Target, Inc. stores since "the stores in the Charlotte market are down to one flavor on the shelf."

Podlucky's response simply dodged the question. On August 19, Hunt requested a tour of the

Phoenix or Latrobe facilities for Le-Nature's' bondholders. Podlucky's bizarre response was

"[un]fortunately we are not allowing any visitors!" On August 30, Hunt wrote Podlucky and

noted that Le-Nature's' claimed quarterly sales of $95 million for the Latrobe facility seemed

"like an awfully large number." Nothing was done, however, to confirm that number or

Podlucky's explanation that the Latrobe plant somehow was running at full capacity (when, upon

information and belief, it never ran at full capacity). Each request and bizarre response put

Wachovia further on notice, yet Wachovia chose to ignore them.

      91.     Most compellingly, however, in August 2005, Kraft Foods, Inc. ("Kraft"), another

potential acquirer of Le-Nature's, identified a stunning flaw in the Fraudulent Scheme:

independent market data on the amount of Le-Nature's product in stores (known as IRI or A.C.

Nielson data) implied sales significantly lower than Le-Nature's' reported sales. On August 1,

2005, Tom Wilson of Wachovia Securities ("Wilson") was forwarded an email from Elena

Kanner, a strategist for Kraft, in which she detailed this gross disparity:

> [Le-Nature's'] Offering Memorandum indicates company net revenue as
> $207MM in 2004, of which 68.7% (142MM) comes from grocery/mass/drug.
> However, ACNeilson data reports only $26MM for 2004 Retail $ sales in 3-
> Outlet (grocery/mass/drug) . . . . and with the retailer margins they reference,
> retail sales should be far higher than net revenue. Furthermore, at the customer
> level, Neilsen-reported retail sales are significantly lower than company-reported

sales in accounts where census data is available (i.e., Pathmark, Shoprite, Safeway, Ingles, and Bashas)

What is driving the discrepancy? . . .

92.     Four days later, Wachovia spelled out the problem in a memorandum to Le-Nature's, in which it softened the problem by stating that the "magnitude" of the discrepancy was "5x in some cases." Of course, as Kanner pointed out, since the $26 million retail sale figure reflected even lower net revenues for Le-Nature's, the magnitude ($142 million reported sales versus something significantly lower than $26 million) was far greater than "5x."

93.     Wachovia's memorandum also addressed the fact that Lynn's ultimate "explanation" for the discrepancy – i.e., that grocery clerks often do not scan cases of water on the bottom of shopping carts – was rejected by Kraft as not a sufficiently significant factor to drive the large discrepancies. Amazingly, although this issue was identified as a serious problem, Wachovia did nothing further and knowingly ignored the obvious implication of Kraft's findings: Podlucky and the Insiders were selling a lot less product than they were claiming to sell.

94.     And then in the next month, September 2005, Wachovia actually recommended that Getzik "tweak" numbers before they were put in Le-Nature's' data room for Kraft review. In an email from Wilson of Wachovia Securities to Getzik, Wilson attached a revised detailed breakdown of SG&A (sales, general, and administrative expenses) but recommended that the breakdown not be distributed to Kraft – "even though [it was] one of their highlighted areas of interest" – because the numbers were at odds with a spreadsheet that had been previously presented to Kraft. Instead, Wilson stated that "[t]his can be something we tweak before putting into the data room." Wachovia was now affirmatively assisting Le-Nature's in its financial reporting shell game, and certainly providing it with no value or benefit.

95.     And in November 2005, another potential purchaser of Le-Nature's, Bain Capital

LLC, raised an additional red flag based on market data in a memorandum sent to Wilson of

Wachovia Securities:

> IRI lists the LeNature's retail price a $1.26 per 128oz volume equivalent for
> unflavored water. This appears inconsistent with the company's internal
> manufacturing costs, volume levels, and wholesale revenues. Is this data correct?

Once again, it appears that nothing was done to follow up on this clear warning sign.

96.     Despite the numerous red flags – and the overt "tweak[ing]" of Le-Nature's'

financial data – Wachovia pushed through a new and needless financing for Wachovia just one

month later, a $100 million add-on term loan facility to supplement the pre-existing loans (the

"December 2005 Facility"). Once again, Wachovia Securities prepared a detailed Confidential

Information Memorandum, which it distributed to potential lenders in the new facility. Among

other things, the Memorandum made specific representations regarding Le-Nature's' net sales,

gross profit, EBITDA, accounts receivable, inventory, debt, and debt service obligations, all of

which were false. For example, the Memorandum reported:

- For the 12 months leading up to September 30, 2005, Le-Nature's
  generated net sales of $271.6 million and EBITDA of $112.3
  million, "resulting in an EBITDA margin of 41.4%, its highest
  level since the Company began operations";

- Compound annual net sales growth through the last twelve months
  period ending September 30, 2005, was 49.3%;

- Since 2003, EBITDA had increased by 98%; and

- For the 12-month period ending on September 30, 2005, Le-
  Nature's sold 69.2 million cases of its product, reflecting
  compound annual growth of 70.9% from 2001.

The real numbers were vastly different. As one example, net sales for all of 2004 and 2005 were

only approximately $40 million, *less than a sixth of the reported figure of $271.6 million for only*

*four quarters out of that two-year period.* Ignoring the obvious signs that the reported figures

were misleading, Wachovia focused instead on the fact that it had "maintained a close relationship with the Company since 2003," and had led, as sole or joint bookrunner, over $400 million in debt financings for Le-Nature's.

97.     On December 6, 2005, Wachovia and Le-Nature's made a presentation to potential lenders at the New York Palace Hotel, which presentation was similar to the ones made in 2003 and 2004.  As with those earlier presentations, the cover slide displayed the "Wachovia Securities" name and logo.  Wachovia Securities' Hullinger again initiated the presentation with a "Transaction Overview" that touted the strength of asset coverage for the loan based, in part, on Le-Nature's' then-existing accounts receivable and inventory.  Hullinger also emphasized the Company's strong sales growth and continued margin improvement.  During the presentation, prospective lenders were provided with information similar to that set forth in the Confidential Information Memorandum, including the exaggerated sales and EBITDA numbers.  Podlucky, Lynn and Getzik attended the presentation on behalf of Le-Nature's and helped Wachovia present extensively and materially false financial information to the lenders.

98.     As a consequence of Wachovia's efforts, Le-Nature's obtained another $100 million in financing, monies that were completely unnecessary and which were ultimately used to pointlessly prolong the failed Le-Nature's enterprise.  Wachovia Securities earned millions of dollars in fees in connection with this financing, and Wachovia Bank continued to act as administrative agent for Le-Nature's' secured lending facilities, which had now grown to $275 million.

99.     As Wachovia knew or knowingly ignored, in a market as competitive as bottled beverages – with huge players like Coca-Cola Enterprises, Inc. ("Coca-Cola"), and Pepsi Co., Inc. ("Pepsi") – Le-Nature's was projecting growth, and building capacity, with reckless

abandon. Indeed, in internal notes generated [at the end of 2005], one Wachovia employee

explicitly stated that Le-Nature's' "growth is not possible" and was "out of control." However,

Wachovia never communicated these concerns to the independent directors on the Board or to

other creditors of Le-Nature's. Instead, it pushed Le-Nature's for more business.

**C.**      **In 2006, The Fraudulent Scheme Began To
Unravel And The Number Of Red Flags Accelerated,
But Wachovia Both Ignored The Implications And
Assisted Podlucky And The Insiders In Hiding The Truth**

100.      By 2006, the Fraudulent Scheme was growing so large that disconcerting facts

regarding Le-Nature's were appearing with greater frequency and in varying circumstances, *e.g.,*

in its financials, in its cash positions, and with respect to the "deposits" that figured so

prominently on the asset side of its balance sheet. Wachovia saw, but knowingly ignored, all of

these red flags.

**1.**      **Anomalies In Le-Nature's' Finances And Operations**

101.      In January 2006, GTCR Golder Davner, LLC ("GTCR"), a company which had

expressed an interest in purchasing Le-Nature's, raised questions about Le-Nature's' pricing and

volume data, which of course were fictitious. Specifically, GTCR could not balance the data on

wholesale pricing of Le-Nature's' "Natural ICE Water" – which indicated a wholesale price of

$6.60 for a case – with actual grocery store pricing that was substantially lower, in the $3.69

(promoted) to $4.99 (unpromoted) range. GTCR's store data were the result of over 40 visits to

retailers like Target, K-Mart and Pathmark in nine different locations, including New York/New

Jersey, Atlanta, Chicago, San Francisco and Phoenix.

102.      Clearly, Podlucky and the Insiders were inflating revenues by, among other

things, adjusting upward what they actually were getting paid for Le-Nature's' beverage

products. Nonetheless, Lynn's response was to tell GTCR – with no support whatsoever – that

the wholesale price was actually $5.60, not $6.60. Of course, this made little sense either because with discounting, it meant retailers were making very little on Le-Nature's' products. Nonetheless, the reckless manner in which Lynn just invented a number should have set off a series of alarms at Wachovia.

103. Not so. In fact, to perpetrate the Fraudulent Scheme, Wachovia Securities actually prepared a presentation for Getzik and Lynn setting forth a strategy for resolving the impasse with GTCR:

> SUGGESTED NEXT STEPS:
>
> We believe the following would be helpful in reconciling GTCR's issues:
>
> Provide updated SKU-level reports (similar to the ones currently in the data room) that show wholesale price of $5.60 (instead of $6.60), as well an explanation of why the current report shows $6.60.
>
> . . .

In short, Wachovia's advice to Le-Nature's was to "cook the books" a little more and memorialize Lynn's fabricated number while creating a story for why a higher number was originally in Le-Nature's' data room.

104. Also in January 2006, James McCreary, a Wachovia Securities risk manager ("McCreary"), pointedly asked Jake Petkovich of Wachovia Securities ("Petkovich") how Le-Nature's' unflavored bottled water business could be "profitable at an average selling price of $2.74 per case?" McCreary advised Petkovich that Wachovia needed Le-Nature's to provide, among other things, "IRI data supporting retail sell through and market share trends." McCreary also recommended arranging "third party or [Wachovia] calls to top customers" of Le-Nature's to verify sales.

105. Apparently, Petkovich did nothing to respond to McCreary's demands. Instead, five months later, in August 2006, Petkovich sent an email to Getzik addressing the same

"$6.60" price versus retail price anomaly that GTCR had identified. Once again, nothing was done to investigate or stop this aspect of the Fraudulent Scheme, and Petkovich instead suggested his own baseless explanation for the gross disparity between wholesale and retail prices: that Le-Nature's' sales people might be offering "buy 5 cases, get one free" deals, thereby bringing down wholesale pricing. Petkovich then asked Getzik, "[a]ny thoughts on that *idea*?" (Emphasis added)

106.    In the end, in early 2006, Podlucky – incapable of offering any reasonable response that would satisfy GTCR's questions – announced that GTCR was "disqualified" as a potential purchaser of Le-Nature's, and that Le-Nature's would not be sold.

107.    Such troublingly defensive and secretive behavior by Podlucky was now common, and yet Wachovia either did nothing or affirmatively abetted such conduct. For example, in response to a January 2006 request from Hunt for answers regarding, among other things, the need for the Florida facility, Podlucky responded: "[e]ffectively immediately the Compan[y] will not respond to any calls." As another example, that same month, an analyst noted to Wachovia that capacity was increasing because of the Phoenix facility, but inventory was not, and "[t]hat doesn't make sense . . . ." The analyst then asked about the treatment of Le-Nature's' operating leases and requested permission to contact Le-Nature's' auditors, BDO Seidman LLP ("BDO"), directly. Wachovia did not react to this significant red flag; instead, it *"discouraged" the analyst from speaking to BDO and bragged to Getzik about doing so.*

108.    And at retail stores, anomalies continued to arise. In April 2006, Wachovia Securities' Hunt sent an e-mail to Lynn noting that Le-Nature's' products were not being stocked in retail stores. Among other things, Hunt indicated that: (a) flavored water had been removed from the shelves at southeast Kroger stores, (b) Dazzlers were removed at Target stores, (c) and

38

other stores were showing weak "sales tempo" and "very little product" for Le-Nature's. No response was apparently forthcoming, yet Wachovia did nothing.

109.     Similarly, on August 20, 2006, Wachovia Securities' Petkovich questioned Getzik about the fact that company projections showed significant increases in inventory while also showing sales of 100 percent of production. Obviously, Podlucky and the Insiders were trying to inflate assets and revenues at the same time, with a conflicting result. Two days later, on August 22, Rice reacted to an article about, among other things, the Delaware Action with this telling query: "[h]ave we had a due diligence session with accountants and inquire[d] specifically how they conduct there [*sic*] revenue audit?" The real question is why Wachovia had not had such a session in the prior three years.

110.     On August 29, 2006 – the day before Wachovia actively sought lenders to buy up the new $285 million September 1, 2006 credit facility (the "September 2006 Facility") – Hunt sent an e-mail to Wachovia highlighting more problems at Le-Nature's. Titled "Questions that need to be answered . . . ," Hunt asked, among other things:

- "Why is the company's interest exposure roughly $4MM a quarter over the last 10 quarters, while debt has increased every quarter?";

- "How does a company of this scale have zero payables?"; and

- "Why did the company suddenly re-enter the commercial tea business after exiting the business a year ago?"

Hunt also noted, "*I find it hard to believe* that Le-Nature's EBITDA margins are a full 10% higher than any other company in the space" (emphasis added).

111.     Wachovia did not answer Hunt's questions. Rather, it obtained commitments from lenders for the full amount of the September 2006 Facility. Only after those commitments were obtained were those questions, and many more, forwarded on to Podlucky. Simply put,

rather than answer the troubling questions raised by its own analyst, Wachovia purposefully brushed the questions aside.

### 2. Lack of Cash and Unpaid Interest

112.   Beginning in December 2005 and carrying through 2006, Wachovia became increasingly aware of how tight cash was at Le-Nature's. Wachovia Bank – which was charged with collecting interest payments from Le-Nature's and distributing them to Le-Nature's' various lenders – *began to make those interest payments on behalf of Le-Nature's*. By 2006, Le-Nature's was habitually late with the interest payments, was overdrawing its bank accounts, and was unable to timely satisfy obligations on its most senior credit facility. Wachovia knew that disclosure of such payment problems would jeopardize any future financings (and thereby jeopardize the associated fees for Wachovia). To hide the problem, Wachovia actually fronted the interest payments to the syndicate lenders.

113.   For example, on December 20, 2005, Sue Patterson of Wachovia Bank ("Patterson") emailed Podlucky and Getzik about nonpayment of interest due six days earlier: "Wachovia has funded the interest payment to the bank group to avoid further delay in payment. Now my account is negative $1,039,232.64." In March 2006, Wachovia Bank paid out nearly $1.9 million in interest, because it had failed to obtain the payment from Le-Nature's. In response, Patterson complained that "[a]nytime there is LIBOR interest due or interim interest due the company does not seem to be in a big hurry to pay me," and noted that "[i]t's very frustrating when I have to pay the bank group on the payment due dates and then try to recover funds [Wachovia Bank] is out for the time period in which we are awaiting the funds." Patterson further complained, "I try to jump through hoops for this company to keep Greg [Podlucky] happy so I would appreciate it if they could pay on time."

114.   Le-Nature's' failure to make timely interest payments continued throughout 2006. In fact, upon information and belief, on August 29, 2006 – two days before the September 2006 Facility closed – Le-Nature's was still behind on its interest payments.  Wachovia never disclosed this disturbing information to Le-Nature's' independent decision makers or its other creditors.

### 3.   Nonexistent Deposits

115.   As noted below, one of the most notorious aspects of the Fraudulent Scheme was the fictitious equipment deposits.  These deposits were supposed to generate refunds in 2004 and 2005 as construction of the Latrobe expansion and Phoenix facility was completed.  In fact, Le-Nature's issued to its lenders a Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") for the first quarter of 2006, which stated that "[a]pproximately $147 million of [equipment] deposits have been returned to the Company through various operating lease agreements finalized during 2005."

116.   In response to that report and calls from bondholders, in April 2006, Wachovia Securities' Hunt asked Podlucky and Getzik:

> Over the last five years, the summation of capex [capital expenditure] equals the absolute growth in PPE [property, plant & equipment] (which includes equipment deposits.  How do I work the $147MM in [deposit] refunds into this equation?

Getzik's answer was a startling admission of, at the very least, reckless and misleading financial reporting:

> After revisiting the statement in the MD&A to which you refer, we've realized that the reference to $147 million is not accurate.  *Actually the Company has only had approx. $90mm returned* . . . . We plan to reissue the MD&A to correct this error.

(Emphasis added) Getzik was admitting to a $57 million error as casually as if he had been conceding a typo in a memorandum to file. Wachovia's response to this disturbing fact was silence.

117.   However, Wachovia's participation in, or knowing indifference to, the Fraudulent Scheme was best revealed when, on May 31, 2006, Getzik again circulated the March 31 MD&A to various investors *without making any amendment thereto regarding returned deposits.* Put another way, on May 31, Le-Nature's – with the full knowledge of Wachovia – was reporting $147 million in refunded equipment deposits even though Getzik had conceded to Wachovia that the number was $90 million (and, of course, the actual equipment deposits were close to zero).

118.   In what may be the most telling example of deception regarding deposits, Hunt also asked why Le-Nature's was making equipment deposits at all. Upon information and belief, equipment lessors understand the accounting requirements of synthetic lease financing (*i.e.*, the equipment lessee must avoid any of the indicia of equipment ownership) and are willing to fund the entire cost of leased equipment. Accordingly, Hunt queried: "Cott [Corporation, a beverage manufacturer] does not put deposits on equipment. Why does Le-Nature's?" Podlucky and Getzik's answer was as startling as it was unsatisfying: "[i]rrelevant and not comparable."

**D.   As Le-Nature's Spiraled Towards Collapse And Ruin, Wachovia Piled On Even More Debt And Reduced Its Own Exposure**

119.   By August 2006, Le-Nature's' financial problems and the growing disputes between management and the preferred shareholders were deeply troubling. Further, because the Delaware Action had sought appointment of a custodian – and had remained unresolved for over 60 days – Le-Nature's was in technical default under the December 2005 Facility. Needing allegedly to both resolve this technical default and obtain a cash infusion, Le-Nature's turned to Wachovia to arrange yet another financing.

120.     At the very end of August 2006, Wachovia informed the lenders under the

December 2005 Facility of the existence of the default and that a new financing would be

structured to replace that Facility.  Wachovia told the lenders that the new facility had to be

funded by September 1, only a few days (and, in many cases, one day) after Wachovia informed

the lenders of the proposal.

121.     Wachovia pitched the new facility to the lenders by explaining that Le-Nature's

had agreed to give them an enhanced yield – *i.e.*, the interest rate was being increased.  This fact

in and of itself was odd because, according to Wachovia, Le-Nature's remained the same strong,

growing company that it was in December 2005 and, thus, it should have had no reason to

capitulate to any group of lenders.  Further, Le-Nature's still had a positive credit rating and was

reporting increasing revenues and climbing EBITDA.

122.     Of course, the lenders were not told about the troubling facts that Wachovia knew

about Le-Nature's and its financial condition and operations.  As an example, even though

Podlucky and the Insiders were projecting positive cash flow by the end of 2006, Wachovia was

internally conceding in late August 2006, that there would be "no cash pay for 5 yrs – outside of

our facility."  At the same time, Wachovia was also questioning Le-Nature's' unreasonably high

margins, as well as its projection that it would sell 100 percent of its production, and the fact that

it was reporting astronomical growth and yet zero payables.  None of these disturbing facts were

conveyed to lenders.

123.     On September 1, the September 2006 Facility closed, and a Wachovia vice

president e-mailed his colleagues to report that the Le-Nature's credit facility was funded.  He

added, "[a]t the end of the day, we reduce our exposure from $19MM drawn against our $25MM

commitment to $0 drawn against what we expect to be a final commitment of under $10mm

43

(target of $7MM, which is inside of our skim of $7.125MM)." In short, Wachovia had: (a) reduced Wachovia Bank's existing exposure to Le-Nature's from $19 million to zero; (b) reduced Wachovia Bank's potential exposure on the new facility from $25 million to approximately $7 million; and (c) earned a massive fee of $7.125 million for its few days of work.

124.    The financings were not finished, however. In order to attempt to settle the Delaware Action – and keep Le-Nature's' preferred shareholders from inspecting the corporate records and learning of the Fraudulent Scheme – Podlucky tried to buy out those shareholders for $280 million, money he did not have. Moreover, as Podlucky and Wachovia both knew, no sale of Le-Nature's was possible because Le-Nature's' finances were not susceptible to even moderate due diligence. Another financing was the only answer.

125.    This time, however, Wachovia hired someone to audit Le-Nature's – for the first time since B&A's March 2003 report. PriceWaterhouseCooper ("PWC") was retained to review Le-Nature's' financial statements and assess how they should be amended. In its final report, PWC noted significant accounting discrepancies, including erroneous accounting of capital leases as operating leases and overstatement of EBITDA.

126.    Nonetheless, Wachovia kept the PWC conclusions to itself and pushed ahead with yet another $285 million in financing for Le-Nature's. Podlucky's desperation for these funds is starkly revealed in his October 14 email to Rice:

> You help me get this done ASAP without further nonsense, i.e., $285 [million] plus bill from PwC, and I will help you with the LTSE and AIM, which an extremely hot and expanding market since the UK and Western Europe are consolidating with Eastern Europe shortly.

127.    Three days later, Podlucky contacted Rice again, claiming that Le-Nature's was now committed to "constructing bottling facilities in Scotland and Germany" and contending

that, for the first time, he detected "an adversarial relationship" with Rice. On that same day,

October 17, 2006, Kevin Scotto of Wachovia Securities reported internally that the Company's

projections were "frankly worthless" and that "[w]e simply don't have confidence in the

projections."

128.   And on October 20, 2006, the Delaware Chancery Court's TRO arrived. Because

it was based on fraudulent conduct against AIG, a Le-Nature's lender, any reasonable bank

would have ceased all business with Podlucky and the Insiders. Not Wachovia, however. At an

October 22, 2006 special meeting of the Board, Jay Braden of Wachovia Securities ("Braden")

advocated a new loan to Le-Nature's to finance the preferred shareholder buyout. Indeed, hours

earlier, Podlucky had pleaded with Braden:

> I have a special board meeting today at 3:00PM. Could you guys be available to
> give the Board an update, please! . . . I will explain to the BOD that the delay is a
> direct result of gathering consents [for the new financing] not Wachovia. I need
> your help to convince the preferreds that the deal can be done!

Braden appeared at the Board meeting and advocated $340 million in new financing, even

though clear evidence of the Fraudulent Scheme was now before the Delaware Chancery Court

and in the public domain. Nonetheless, the Le-Nature's directors designated by the minority

preferred shareholders made it clear that no such financing would be allowed.

129.   In an undated internal situation update that was clearly prepared after the TRO,

Wachovia conceded that the TRO had issued after "the court was presented with evidence that

the Company . . . engaged in . . . prohibited/fraudulent activity." Nonetheless, Wachovia set

forth the following two options:  (1) "underwrite and fund a $340 million holding company

bridge facility (to redeem preferred shareholder equity interests and repay non-consenting lessors

[*i.e.*, the defrauded AIG]) . . ." or (2) "continue to pursue a best efforts refinancing." *The only*

45

*reasonable option – cease business with a known criminal enterprise –apparently was not even considered.*

130.    On November 1, 2006, Le-Nature's was forced into bankruptcy and taken over by KZC, and the Fraudulent Scheme was over. However, that Scheme – perpetrated by Podlucky and the Insiders with the substantial assistance of Wachovia, among others – dragged out the life of Le-Nature's for over four years and wasted hundreds of millions of dollars on avoidable transactions in the process. The independent decision makers of Le-Nature's, had they known the truth about Le-Nature's and its unsustainable operations, could have blocked Podlucky's expansion efforts, moved to stop the unnecessary financings promoted by Wachovia, and closed Le-Nature's' operations down years earlier.

**III.    CIT Group, Marshall, Krones And Pollinger Substantially
Assisted Podlucky And The Insiders In Siphoning Off And
<u>Squandering More Than $110 Million From Equipment Lease Financing</u>**

131.    The Fraudulent Scheme also included approximately $118 million in monies skimmed out of the financings that were obtained by Le-Nature's ostensibly to pay for the equipment leased for the Latrobe expansion, Phoenix construction, and planned Florida projects. Indeed, these skimmed monies amounted to over 50 percent of *all the funds provided by equipment financiers for Le-Nature's expansion programs in Latrobe, Phoenix and Florida.* The manner in which Podlucky and the Insiders – with the substantial assistance of CIT Group, Marshall, Krones and Pollinger – skimmed this money was as simple as it was outrageous.

**A.    Krones And Pollinger Substantially Assisted Podlucky's
Scheme To Create False And Nonexistent Equipment
Deposits And Divert Equipment Financing Monies**

**1.    Pollinger Falsely Confirms The Existence Of
Over $160 Million In Equipment Deposits And Skims
Financing Monies For Itself And Le-Nature's**

132.    As discussed above, Podlucky and the Insiders booked large amounts of

equipment deposits in Le-Nature's financial records that supposedly had been made to Pollinger,

an equipment manufacturing broker.  In fact, Le-Nature's' financial records showed that at times

Pollinger was holding hundreds of millions of dollars in such deposits.

133.    Of course, that such an enormous sum was entrusted to a two-man company

operated out of a house in North Carolina should have raised alarms in and of itself.  For

example, what exactly was Pollinger, what assets did it have, what was its credit rating, where

exactly were these two men keeping that money?  In a single bank account?  Nonetheless, even

though no such deposits existed, in the years 2003 through 2006, Pollinger returned

confirmations to the accountants for Le-Nature's fraudulently attesting to the fact that it held

such monies.  D.K. Pollinger signed the fraudulent confirmations and P. Pollinger was aware of

them.

134.    In addition, in or around 2002, Le-Nature's began construction of the PET facility

at its Latrobe, Pennsylvania headquarters.  To construct that facility, Podlucky worked

exclusively with Pollinger, which purported to be a manufacturer's representative for equipment

manufacturers.  One of Pollinger's roles was to arrange financing for the equipment from

equipment lessors.  Podlucky and Pollinger (through its principals, D.K. Pollinger and P.

Pollinger), however, devised a scheme to defraud certain equipment lessors for Latrobe, using a

simple "bait-and-switch."  Specifically, after Pollinger would secure lease financing for a

particular piece of a manufacturer's equipment, Pollinger would then switch out that piece of

47

equipment for something much cheaper. The equipment lessor would then end up paying

Pollinger – the manufacturer's representative – more than Pollinger had to pay the manufacturer.

135.   In other circumstances, Podlucky and Pollinger inflated the cost of equipment or

fraudulently obtained financing for equipment that did not exist. In each case, equipment

financiers paid too much, and Pollinger sent the excess to Le-Nature's.

136.   As Podlucky continued to record increasing phony revenue, he still needed a way

to balance his books. He again turned to Pollinger. Podlucky recorded on forged statements for

a Merrill Lynch bank account in the name of Le-Nature's fictitious wire transfers to Pollinger,

which allegedly constituted equipment deposits for the Phoenix facility. By doing so, Podlucky

was able to reduce the month-end closing balance on his forged bank statements so it matched

the actual month-end closing balance in the Merrill Lynch account. As a result, Le-Nature's'

Real World computer system (*i.e.*, the one containing fabricated data) reflected over

$100 million in transfers of equipment deposits to Pollinger in 2004 alone.

137.   As Pollinger, through its principals D.K. Pollinger and P. Pollinger, knew, every

penny of those reported monies were false and corresponded to equally fictitious revenue.

Nonetheless, Pollinger continued to assist Podlucky and the Insiders in perpetrating the

Fraudulent Scheme. Indeed, in February 2006, Pollinger returned a confirmation, fraudulently

attesting to the fact that it held over $163 million in deposits just for 2005 – and over $200

million in total – or more than one third of Le-Nature's' assets.

### 2. Krones Assists Podlucky In Skimming Monies Out Of Equipment Financing And Works To Actively Conceal The Scheme When An Informant Threatens To Reveal It

138.   According to Podlucky and financial materials prepared by Wachovia, CIT Group

and Marshall, the "deposits" purportedly sent to Pollinger were, over time, transferred to Krones,

the manufacturer of most of equipment slated for installation in the Latrobe bottle manufacturing

48

facility and the Phoenix plant. Such transfers would have made little sense, because they would have jeopardized the intended accounting treatment of the synthetic lease financing that Podlucky and the Insiders used for Le-Nature's' various construction projects. Once again, synthetic lease accounting rules are strict and preclude the lessee from any conduct that could be construed as taking ownership of the leased equipment. Sending tens of millions of dollars to Krones as "deposits" on that equipment clearly jeopardized synthetic lease accounting treatment. Nonetheless, at varying points in time, Krones was shown as holding over $140 million worth of deposits (which, in fact, never existed).

139.    In or about August 2004, Krones and Le-Nature's entered into a Project Management Agreement, through which Krones agreed to manufacture all or substantially all of the bottling equipment for the Phoenix facility. Soon thereafter, Krones started to receive monies from financers for the equipment that Krones AG was manufacturing. Upon receipt of such funds, Krones was supposed to refund the "deposits" to Le-Nature's. However, because the deposits were fictitious, no refunds were possible. Thus, Podlucky and the Insiders, with the substantial assistance of Krones, revised and enhanced their scheme for extracting "deposits" from the funds received from equipment financiers/lessors: they inflated the cost of manufactured equipment in the invoices/schedules provided to Le-Nature's' equipment financiers.

140.    With respect to the Phoenix facility, Krones was a principal perpetrator of this significant aspect of the Fraudulent Scheme. In fact, Krones actively participated in this equipment cost deception even though defendant Kronseder and other officers of Krones had been contacted by an informant who revealed that the purported cost of the Phoenix equipment

was inflated by as much as $90 million. The informant was apparently someone who was or had been employed by or affiliated with Krones.

141.    Indeed, in a verified complaint filed in Arizona (the "Arizona Action"), CIT Group avers that both Sommer of Krones USA and Kronseder of Krones AG were aware of the informant's allegations of inflated pricing and fraudulent equipment financing. However, those same sworn allegations state that despite this knowledge, Sommer and Kronseder worked with Podlucky to continue the deception by vouching for the accuracy of the Le-Nature's financing transaction by fabricating equipment schedules that supported the higher, fraudulent prices and offering up excuses for why financing seemed to be more than equipment costs. The mere extent of this aspect of the Fraudulent Scheme – over half of the equipment financing was skimmed off and sent to Le-Nature's – makes it inconceivable that Krones, the equipment manufacturer, was not an active and willing proponent of that Scheme.

142.    As to these acts, Krones acted through its principals and executives, including Kronseder and Sommer. Indeed, in the same sworn allegations, CIT avers that senior members of Krones were told "on numerous occasions" that Le-Nature's was "seeking to perpetrate a fraud by double leasing" equipment for Phoenix and were provided with written evidence of the overpricing. At all relevant times, Sommer was the President of Krones USA and Kronseder the majority shareholder of Krones AG. When personally confronted with the information that a "whistleblower" was passing around the true equipment costs, true costs that Sommer and Kronseder knew to be accurate, Sommer and Kronseder actively participated, substantially assisted, or knowingly failed to stop Krones, Podlucky and the Insiders from continuing to use the false costs. In this way, Sommer and Kronseder allowed the Fraudulent Scheme to continue and exacerbated it by preparing for Podlucky and the Insiders' benefit a cost spreadsheet