**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

In Re:  Le-Nature's Inc.                  MDL Docket no. 2021
                                          WDPA Docket no. 2:09-mc-00162

Marc S. Kirschner, solely in his capacity as    )
the Liquidation Trustee of the Le-Nature's      )
Liquidation Trust,                              )   Civil Action No. 08-1518
                                                )
                          Plaintiff,            )
         vs.                                    )
                                                )
Wachovia Captial Markets, LLC, et al.,          )
                          Defendants.           )

AMBROSE, Chief District Judge

**OPINION AND**
**ORDER OF THE COURT**

**KRONES DEFENDANTS' MOTION TO DISMISS**

Pending before the court is a Motion to Dismiss filed by Defendants, Krones AG, Krones

Inc., Heinz Sommer, and Dr. Volker Kronseder (hereinafter, collectively referred to as "Krones"),

seeking to dismiss all claims asserted against them (counts Three, Four, Seven, Eight, Nine and

Twelve) in Plaintiff's Complaint.[1]  (Docket No. 85 at 8-cv-1518 and Docket No. 62 at 9-mc-162).[2]

---

[1] Count Three of the Complaint is a RICO claim under 18 U.S.C. §1962(c), (Docket No. 1, ¶¶ 210-221);
Count Four of the Complaint is a RICO claim under 18 U.S.C. §1962(d), (Docket No. 1, ¶¶ 222-232); Count Seven
of the Complaint asserts a fraud claim, (Docket No. 1, ¶¶ 255-264); Count Eight of the Complaint raises a claim for
conspiracy to commit fraud, (Docket No. 1, ¶¶ 265-274); Count Nine of the Complaint is a claim for aiding and
abetting fraud, (Docket No. 1, ¶¶ 275-285); and Count Twelve of the Complaint is a claim for aiding and abetting
breach of fiduciary duty.  (Docket No. 1, ¶¶ 296-307).

[2] The Motion to Dismiss is dual filed at the civil action number (08-cv-1815) and the miscellaneous number
(09-mc-162).  Docket numbers cited herein refer solely to the civil action number.

1

Plaintiff, Marc S. Kirschner ("Kirschner"), in his capacity as Liquidation Trustee of the Le-Nature's

Liquidation Trust, filed a Memorandum of Law in Opposition thereto. (Docket No. 106) and Krones

filed a Reply Memorandum in Support of the Motion to Dismiss (Docket No. 115-2). After careful

consideration of the same, said Motion (Docket No. 85) is denied as more fully set forth below.

## OPINION

### A. Applicable Standards

Defendants filed their motion to dismiss pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and

12(b)(6).[3]  When deciding whether to grant or deny a 12(b)(6) motion the Supreme Court has held:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 555 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007).

(Citations, quotes and footnote omitted). *See also*, *Phillips v. County of Allegheny*, 515 F.3d 224,

234 (3d Cir. 2008) (a plaintiff's factual allegations must be enough to raise a right to relief above the

speculative level).

Most recently, in *Ashcroft v. Iqbal*, ___ U.S.___, 129 S.Ct. 1937 (2009), the Supreme Court

held, ". . . a complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual

---

[3] F.R.Civ.P. 12(b)(1) allows a party to challenge the court's subject matter jurisdiction based on the face of the complaint or raise a factual challenge to the jurisdiction alleged in the complaint. The Third Circuit has explained that a 12(b)(1) factual challenge motion differs from a 12(b)(1) facial challenge motion and a 12(b)(6) motion. *Mortensen v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3d Cir.1977). In the immediate case, Defendants have raised a facial attack to the Complaint, which is akin to a 12(b)(6) challenge.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. (Citations and quotes omitted).

In *Iqbal,* the Court specifically highlighted the two principles which formed the basis of the *Twombly* decision: First, for the purposes of a motion to dismiss, courts must accept as true all factual allegations set forth in the complaint, but courts are not bound to accept as true any legal conclusions couched as factual allegations. *Id.* at 1949-1950. *See also, Fowler v. UPMC Shadyside*, ___ F.3d ___ (3d Cir. 2009), 2009 WL 2501662.  Second, a complaint will only survive a motion to dismiss if it states a plausible claim for relief, which requires a court to engage in a context-specific task, drawing on the court's judicial experience and common sense. *Iqbal* at 1950.  Where well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – the complainant is entitled to relief. *Id., citing*, F.R.Civ.P. 8(a)(2).

## B.  Factual Background

With the above law in mind and solely for the purposes of ruling on this motion, I assume the following facts are true:

Plaintiff is a trustee appointed by the bankruptcy court.  The debtor is Le-Nature's Inc. ("Le-Nature's" or "the corporation").  Le-Nature's was a beverage manufacturer, bottler and distributor based in Latrobe, Pennsylvania.  Gregory Podlucky ("Podlucky") was the chief executive officer of Le-Nature's, its majority shareholder, and the chairman of its board.  Complaint, ¶¶ 1-34.

Podlucky's brother, Jonathan Podlucky, served as the chief operating officer, David Getzik served as the chief financial officer, Robert Lynn was the executive vice president, and Andrew Murin was an adviser to Podlucky.  Podlucky's brother, Getzik, Lynn and Murin were all members

of Le-Nature's board of directors and all were nominated to the board by Podlucky.  Complaint, ¶¶ 35-37. At times, these individuals are collectively referred to as "the Insiders."

Le-Nature's produced its first beverage product in 1992, and by 2005, claimed to be producing nearly 60 different products.  The growth in the alleged variety of products it sold purportedly spurred growth in its gross sales, net sales and profits.  However, Plaintiff has asserted that between 2002 and 2005, due to a fraudulent scheme advanced by Podlucky along with the Insiders, Le-Nature's reported sales were grossly disproportionate to its actual sales.  Complaint, ¶¶ 42, 44-45.

These inflated sales figures enabled Le-Nature's to raise capital with the assistance of the Defendants, in particular, Wachovia Capital Markets, LLC d/b/a Wachovia Securities, Wachovia Bank, National Association (hereinafter referred to collectively as "Wachovia"), Krones, CIT Group/Equipment Financing, Inc. (hereinafter "CIT"), Marshall Financial, Inc., and Marshall Investments Corporation (hereinafter "Marshall"). Together with Podlucky and the Insiders, these parties engaged in a form of a "Ponzi"scheme – constantly raising money and incurring ever-increasing debts to refinance investors while cultivating the illusion of a legitimate profit-making business. ¶¶ 1-2.

Specifically, Kirschner alleges that Krones inflated prices on equipment for new Le-Nature's bottling line equipment and assisted Podlucky and the Insiders in securing financing based on these inflated prices.  Kirschner asserts that CIT and Marshall knew the equipment prices were inflated but still arranged for "synthetic lease" equipment lease financing based on the bogus prices.  Krones, CIT and Marshall reaped significant fees by using these inflated figures while Podlucky and the Insiders received the excess revenue from the inflated pricing. ¶¶ 11, 13, 16-18, 134-142.

4

In addition to the actions of Krones, CIT and Marshall, from April of 2003 through December of 2005, Wachovia arranged a series of credit facilities for Le-Nature's.  In an effort to secure lenders for each facility, Wachovia assisted Le-Nature's in the preparation and distribution of a "Confidential Information Memorandum," but these memoranda materially misrepresented (among other things) Le-Nature's sales and profits.  These credit facilities were supposed to generate funds for the expansion of Le-Nature's production lines. Although Le-Nature's did expand its production lines by expanding the capacity of its Latrobe, Pennsylvania plant in 2003 and by building a new bottling plaint in Phoenix, Arizona in 2005, Plaintiff asserts these expansions were unnecessary given the false sales figures and further believes the credit facilities were undertaken to finance and prop up Le-Nature's slumping operations. Complaint, ¶¶ 42-46, 60, 62, 72, 76, 81, 96.

In May of 2006, the minority preferred shareholders (who were represented by three independent directors on the Le-Nature's board), initiated an action in the Delaware Chancery Court against the corporation, Podlucky, his brother, Murin and Lynn.[4]  In June of 2006, the Chancery Court entered a preliminary injunction restraining Le-Nature's company from taking certain steps, such as making capital expenditures in an amount in excess of $1,000, without minority shareholder approval. Complaint, ¶ 48.

In October of 2006, LeNature's preferred minority shareholders were told that Podlucky had

---

[4] Kirschner's complaint explains that in addition to the credit facilities, in 2000 and 2002, Le-Nature's issued over 8 million shares of convertible preferred stock. This stock was purchased by three investment funds – the "Pelham Fund" and two separate "Baum Funds."  Pelham Fund's nominee to La-Nature's Board of Directors was Venita Fields, and the Baum Funds' nominees were Ruth Huet and Ford Bartholomew.  In 2006, William Thomas replaced Ford Bartholomew.  These board members allegedly had no knowledge of the "form, substance or magnitude" of the alleged scheme and when they became aware of it, they filed for relief in the Chancery Court. Complaint, ¶¶ 183-185.

converted funds deposited by one of the corporation's equipment lessors, AIG.  This information was

passed to the shareholders upon AIG's discovery that Krones had transferred nearly $20 million of

AIG's deposit to Le-Nature's based on a forged AIG letter "authorizing" the transfer of funds.  On

October 20, 2006, following the revelation of the forgery, the Delaware Chancery Court issued a

temporary restraining order and on October 27, 2006, the Court approved the preferred minority

shareholders' request for the appointment of a custodian for Le-Nature's, and named Kroll Zolfo

Cooper, LLC ("KZC") as custodian.[5]   On November 1, 2006, the managing director of KCZ filed

an affidavit with the Chancery Court detailing financial discrepancies at Le-Nature's.    Also on

November 1, 2006, several of Le-Nature's creditors initiated involuntary bankruptcy proceedings.

Complaint, ¶¶ 49-53.

Since the initiation of the bankruptcy proceedings, the investigation led by Kirschner has

---

[5] I take judicial notice of the Chancery Court's October 27, 2006, order appointing a custodian to take "possession and control of Le-Nature's . . . its business, operations and . . . Assets, and to temporarily administer and manage the Assets, operate [Le-Nature's] business . . . " until further order of the Court, and holding Le-Nature's and its Assets were *in custodia legis*, meaning they could not be distrained, nor otherwise interfered with by a private person. (Docket No. 91-2, ¶¶2-3).

The Order also states, "... until otherwise ordered by the Court . . . [Podlucky, Podlucky's brother, Murin, and Lynn] . . . shall cooperate with the Custodian . . . and shall accept the instructions of the Custodian with respect to [Le-Nature's] and the Assets and shall act with and under the supervision, consent and instruction of the Custodian with respect to same and, in so doing, are hereby restrained and enjoined from (i) making, or committing [Le-Nature's] to make, any expenditure of Company funds, (ii) accessing, tampering with or destroying any [Le-Nature's] property, books or records, (iii) selling, leasing or otherwise disposing of . . . any assets of [Le-Nature's] . . . (iv) making, or committing [Le-Nature's] to make, any loans, advances or investments of any kind or nature, or entering into, or committing [Le-Nature's] to enter into, any guarantees, and (v) causing or committing [Le-Nature's] to incur any debt or otherwise to become liable to any party for any reason. [Le-Nature's and Podlucky, Podlucky's brother, Murin, and Lynn] shall not take any actions . . .without the consent of the Custodian . . .." *Id.* at ¶4.

Finally, the Order notes, "...until otherwise ordered by the Court . . .  [Podlucky, Podlucky's brother, Murin, and Lynn] are hereby restrained and enjoined from withdrawing or transferring any funds from [Le-Nature's] bank or other financial accounts. . . .The Custodian may take such action and incur ... such costs and charges, and make disbursements as may be actually necessary for taking possession and control of the Assets, preserving the Assets, operating [Le-Nature's] business in the ordinary course... In the event that the Custodian determines that it is in the best interest of [Le-Nature's] to take any action other than in the ordinary course of business, the Custodian shall make such a recommendation as it deems appropriate to [Le-Nature's] board of directors; . . . if the board of directors does not unanimously approve the recommendation action, [Le-Nature's] may apply to the Court on notice to plaintiffs and defendants for authorization to take such action as it deems to be necessary or desirable." *Id.* at ¶9.

uncovered two separate accounting systems at Le-Nature's: one system ("Navision") tracked actual sales, accounts payable, inventory, etc. while the other system ("Real World") contained primarily fraudulent numbers to which only Podlucky and one Le-Nature's employee (Ms. Andreycak) had access. In addition, a secret room was discovered at the Latrobe bottling facility which held safes that contained jewelry purchased by Podlucky.  Podlucky also purchased over 8,000 Lionel model trains and was building a mansion for his personal residence.  Kirschner avers that the jewelry, trains and residence were all paid for with monies Podlucky embezzled from Le-Nature's through the "scheme."  Complaint, ¶ 54.

## C. Discussion

### 1. The Krones Defendants' *In Pari Delicto* Argument

Krones primarily argues that the equitable doctrine of *in pari delicto* bars Kirschner from asserting any claims against the Krones Defendants. *In pari delicto*, which literally means "in equal fault," is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct. *Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 2070 (1988). *See also*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 2626-2627, 86 L.Ed.2d 215 (1985)(common-law defense derives from the Latin, *in pari delicto potior est conditio defendentis*: In a case of equal or mutual fault the position of the defending party is the better one.) The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. *Bateman Eichler,* 472 U.S. at 306.[6]

---

[6] Krones seemingly cites *Pinter* for the proposition that *in pari delicto* always bars recovery. The Court in *Pinter*, however, used the phrase "may be barred" when discussing whether a plaintiff can recover from an equally at fault defendant, and the *Pinter* Court also suggested denying relief to an "admitted wrongdoer" forms the basic

However, *in pari delicto*:

> . . .is a murky area of law. It is an ill-defined group of doctrines that prevents courts
> from becoming involved in disputes in which the adverse parties are equally at fault.
> Courts in Pennsylvania have not been of one mind as to whether the doctrine is legal
> or equitable. *Compare Sacco v. Twp. of Butler*, 863 A.2d 611, 615 n. 3
> (Pa.Commw.Ct.2004) (referring to doctrine as "equitable") with *Feld & Sons, Inc.*
> *v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545, 548
> (Pa.Super.Ct.1983) (referring to the "common-law" doctrine of *in pari delicto* ).

*Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Research Foundation*

*v. PricewaterhouseCoopers, LLP,*  No. 07-1397, 2008 WL 3895559, *5 (3d Cir. July 1, 2008)

(footnote omitted).

Krones posits that its alleged culpability along with Le-Nature's arose out of the same illegal

or wrongful acts and as such, Krones suggests that Le-Nature's would be barred by the doctrine of

*in pari delicto* from bringing this lawsuit against Krones.  Krones concludes that because Kirschner

"stands in the shoes" of Le-Nature's, he too is barred from recovery under the doctrine of *in pari*

*delicto*.  Krones primarily relies on *Official Committee of Unsecured Creditors v. R.F. Lafferty &*

*Co., Inc.*, 267 F.3d 340 (3d Cir. 2001), ("*Lafferty*"), for this argument.

In *Lafferty*, two debtor corporations filed for bankruptcy after a "Ponzi scheme" collapsed

leaving the investors in these corporations with substantial losses.  The scheme was orchestrated by

the corporate debtors' sole shareholder, William Shapiro, who issued fraudulent debt certificates on

behalf of the corporations.   When the corporations had no prospect of repaying the debt, the

corporations sought protection through bankruptcy.   Subsequent to the bankruptcy filings, the

debtors' estates, through their creditors' committees, brought claims alleging that third parties had

---

premise for imposing the *in pari delicto* doctrine.  (Emphasis added). Thus, contrary to Krones' argument, there may
be times when a plaintiff can recover.

fraudulently induced the debtor corporations to issue debt securities thereby deepening their insolvency and forcing them into bankruptcy.

One of the main issues in the *Lafferty* case was whether the *in pari delicto* doctrine would bar the claims brought by the creditor's committee on behalf of the debtors' estates. The Court of Appeals for the Third Circuit held that *in pari delicto* could bar the claims if Shapiro's conduct could be imputed to the corporations and hence to the creditors' committees since the committees stood in the shoes of the debtor-corporations.

The *Lafferty* Court broke its analysis into two parts. First, it determined that 18 U.S.C. § 541 specifically precluded courts from taking into account events which occur after the commencement of a bankruptcy case. Since the creditors' committees were appointed after the filing of the bankruptcy case, the Court evaluated the *in pari delicto* defense without regard to the fact that the committees were "innocent successors". Relying in case law from the Tenth, Sixth and Seventh Circuits, the *Lafferty* court held that a creditors' committee (or a bankruptcy trustee), who stands in the shoes of the debtor, could be barred by doctrine of *in pari delicto* even when the committee holds the status of an innocent successor.

Having reached a conclusion on the first part of its analysis, the *Lafferty* Court next questioned whether Mr. Shapiro's acts and conduct could be imputed to the corporations. The Court held that fraud of an officer could be imputed to a corporation when the officer commits fraud: (1) in the course of his employment, and (2) for the benefit of the corporation. After determining that Mr. Shapiro had committed fraud in the course of his employment, the Court analyzed whether his fraudulent conduct was perpetrated for the benefit of the corporations. Although the Court noted that

it would ordinarily apply the adverse interest exception[7] to ascertain whether fraudulent conduct could be imputed, under the facts of the *Lafferty* case, Mr. Shapiro's status as a sole shareholder led the court to apply to the "sole-actor" exception.  The Court held:

> The general principle of the "sole actor" exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. [Cite omitted.] The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability. [Cites omitted.]

267 F.3d at 359. As a result of this analysis, the majority of the *Lafftery* Court concluded: (1) Shapiro's conduct could be imputed to the corporations, and (2) the doctrine of *in pari delicto* barred the creditors' committees, which stepped directly into the shoes of the corporate debtors (post the filing of the bankruptcy petition), from bringing their claims.

Kirschner distinguishes *Lafferty* from the instant matter on the following grounds: First, Kirschner assumed control of Le-Nature's indirectly, *vis-a-vis* from a court-appointed custodian (KCZ) who ran the company for a brief period of time <u>before</u> the bankruptcy petition was filed; and second, since the alleged fraud was only perpetrated by some of the debtor's shareholders, imputation of that fraud to the corporate debtor cannot occur. In the alternative, Kirschner argues that even if the debtor's conduct could be imputed to a trustee, the fraud was not perpetrated to benefit the debtor and thus falls outside the adverse interest exception.   After a review of the facts of this case, in the light most favorable to the non-moving party and as more fully explained below, I agree with Kirschner that the appointment of KCZ precludes the application of the doctrine of *in pari*

---

[7] Under the adverse interest exception, fraudulent conduct will be imputed when the officer's conduct or fraud is committed for the benefit of the corporation and will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation.  *Thabault v. Chait,* 541 F.3d 512, 527 (3d Cir. 2008).

*delicto* in this case.

Like the *Lafferty* Court, I begin my analysis with section 541 of the bankruptcy code.  The legislative history to section 541 of the bankruptcy code states:

> Though this paragraph will include . . . claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred . . . then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

*See,* Senate Report, 95-989, 1978 U.S.C.C.A.N. 5787, 5868.  From this, the Third Circuit has consistently held that "[a bankruptcy] trustee stands in the shoes of the debtor."  *See e.g., In re: Personal and Business Insurance Agency, Debtor James K. McNamara, Esq., Trustee, v. PFS a/k/a Premium Financing Specialists*, 334 F3d 239, 245 (3d Cir. 2003) (in actions brought by trustee as successor to debtor's interest under section 541, the 'trustee stands in the shoes of debtor and can only assert those causes of action possessed by debtor), *quoting*, *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 (3d Cir. 1989).

Accordingly, under section 541, the trustee stands in the shoes of the debtor – in this case, Kirschner stands in Le-Nature's shoes – and may prosecute any claims or causes of action that the debtor can pursue.  Similarly, if Le-Nature's is barred from bringing a claim, then Kirschner would likewise be barred.[8]  Although the *Lafferty* analysis applies to this case, the facts of the instant matter differ from *Lafferty,* and thus alter the outcome.

The first part of the *Lafferty* analysis requires a determination as to when relevant events transpired – before or after the bankruptcy filing.  Unlike the facts in *Lafferty,* Le-Nature's essentially

---

[8] The legislative history to section 541 provides an example wherein a claim is barred by the statute of limitations. The example assumes the debtor is barred from bringing a claim because of the statute of limitations, and concludes that the trustee would likewise be barred. 1978 U.S.C.C.A.N. 5787, 5868.

rid itself of corrupt influence of certain corporate officers <u>prior</u> to the bankruptcy filing when the Chancery Court installed KCZ and empowered KCZ to run the company.  As discussed above, in May of 2006, at the request of Le-Nature's minority shareholders, the Delaware Chancery Court restricted Podlucky and the Insiders' authority to do certain things without the minority shareholders' approval.  In October of 2006, when evidence surfaced indicating that Podlucky and the Insiders ignored the Court's prior order and possibly engaged in criminal conduct (the forgery of an AIG document), the minority shareholders again sought assistance from the Chancery Court. In response, the Court appointed KCZ[9] and ordered a complete usurpation of corporate authority rendering Podlucky and the Insiders impotent to run Le-Nature's.[10]  Thus, by the time Le-Nature's was pulled involuntarily into bankruptcy, KCZ had been running the company for several days.  Because KCZ was appointed <u>before</u> the filing of the bankruptcy case, and because Kirschner stepped into the shoes of Le-Nature's which was then being run by this custodian who was <u>not</u> engaged in any sort of fraudulent conduct, there is no fraud to impute to Kirschner.

Unlike the facts in *Lafferty*, I must evaluate the *in pari delicto* doctrine in light of the fact that when Kirschner stepped into the shoes of Le-Nature's it was no longer being operated by a corrupt management team (Podlucky and the Insiders) due to the minority shareholders who convinced the Chancery Court to replace the leadership.  Thus, at the moment the bankruptcy was filed, Le-

---

[9] *See*, footnote 5 relating to the Delaware Chancery Court's order dated October 27, 2006.

[10] As indicated in the Delaware Chancery Court's order, the Custodian had complete control of Le-Nature's day-to-day operations and was in sole control of conducting Le-Nature's business in the ordinary course of business without seeking leave or permission from Podlucky or the Insiders.  To the contrary, Podlucky and the Insiders relinquished all day-to-day control. Moreover, if and when the Custodian needed "to take any action other than in the ordinary course of business" he could petition the Chancery Court if Podlucky and the Insiders as board members refused to enable the Custodian to act on the extraordinary business.  (Docket No. 91-2.)  Thus, according to the Delaware Chancery Court's order, KCZ, in essence, was subject only to the court.

Nature's was not being run by the wrongdoers who allegedly engaged in fraud.[11]  This distinction alone leads me to conclude that since Le-Nature's alleged wrongdoing shareholders were stripped of their power by the alleged innocent minority shareholders prior to the bankruptcy filing, there was nothing to impute at the time of the bankruptcy filing, and accordingly, the *in pari delicto* doctrine cannot apply to bar Kirschner's claims against Krones.[12]

### 2. The Krones Defendants' "No Legally Cognizable Harm" Argument

Krones argues that Le-Nature's sustained no legally cognizable harm as the result of any

---

[11]  I find Judge Cowen's dissent in *Lafferty* instructive on this point.  He notes that the *Lafferty* majority concluded that the creditors' committees were barred from recovery because "at the moment the bankruptcy was filed . . .the wrongdoers had not actually been removed yet." 267 F.3d at 362. In *Lafferty,* the trustee took over a company which, until the moment the trustee assumed control, had been run by a corrupt shareholder. This directly contrasts with the facts of the immediate case.  Although Krones suggests that the brief period of the time the custodian actually controlled Le-Nature's prior to the bankruptcy filing was not enough to "cleanse" the company of the "taint," I disagree based on the majority and dissenting opinions in *Lafferty.*

[12]  Even assuming, *arguendo*, that the minority shareholder's actions, KCZ's succession, and KCZ's control over Le-Nature's (all of which predated the filing of the bankruptcy) are of no moment, the second part of the *Lafferty* analysis – where the Court questions whether the acts and conduct of Podlucky and the Insiders can be imputed to Le-Nature's – also fails.

State substantive law controls when imputation of fraud can occur. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *accord, Larry Waslow, Trustee v. Grant Thornton, LLP  (In re Jack Greenberg Inc.),* 240 B.R. 486, 501 (E.D.Pa. 1999).  In Pennsylvania,  imputation of fraud from the agent to the principal is not automatic, especially given the circumstances present in this case. *See,  Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Research Foundation v. Pricewaterhouse Coopers, LLP*, (*"AHERF I"*), No. 2:00 cv 684, 2007 WL 141059, *8 (W.D.Pa. January 17, 2007), *Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Research Foundation v. PricewaterhouseCoopers, LLP*, (*"AHERF II "*), No.  07-1397, 2008 WL 3895559, *3 (3d Cir. July 1, 2008), *order granting petition for certification of question of law,* August 26, 2008, at Pa. Supreme Court docket no. 38 WAP 2008.

In *AHERF II,* the Third Circuit noted that Pennsylvania's Supreme Court in *Aiello v. Ed Saxe Real Estate Inc.*, 508 Pa. 553, 499 A.2d 282 (1985) held that the primary rationale for imputing an agent's fraud to his principal is that doing so protects <u>innocent</u> third parties who do business with the agents of the principal. The Court found that under the *AHERF I* facts, imputation was "being used to shield a non-innocent third party from liability that would otherwise attach."  *AHERF II,*  2008 WL 3895559 at *4.

In *AHERF II*, the Third Circuit opted not to predict, but rather chose to certify the very question at issue here – whether an agent's (Podlucky and the Insiders) fraud should be imputed to the principal (Le-Nature's) when it is an allegedly non-innocent third party (Krones) who seeks to invoke the law of imputation to shield itself from liability.  No matter what Pennsylvania's Supreme Court ultimately decides – *i.e.* whether the agent's subjective intent must be considered, whether the outcome of the agent's actions is all that matters, or whether imputation can ever be used as a shield by non-innocent third parties – the imputation question turns upon facts and thus, to grant a motion to dismiss without discovery on the matter would be premature.

action or inaction taken by the Krones Defendants. They assert three bases for this argument: (1) the alleged injury to Le-Nature's is based solely on the deepening insolvency theory which the Third Circuit rejected in *CitX Corporation Inc. v. Detweiler, Hershey and Associates P.C.,* 448 F.3d 672 (3d Cir. 2006); (2) Podlucky's and the Insider's waste was the sole proximate cause of Le-Nature's injury; and (3) Kirschner's allegation that Le-Nature's was insolvent before it contracted with Krones, defeats Kirschner's claims against Krones.  Kirschner responds by stating: (1) he has not asserted a deepening insolvency claim, but even if he did, his claim would be recognized by Pennsylvania law; (2) Krones' conduct was a substantial factor which contributed to Le-Nature's damages; and (3) Le-Nature's insolvency does not preclude Kirschner as the trustee from brining claims against Krones.

### a. Deepening Insolvency Theory

Krones first argues that Kirschner is attempting to recover damages based upon a theory of deepening insolvency. Specifically, Krones claims that Kirschner's complaint asserts that the Krones Defendants helped an already-insolvent Le-Nature's: (1) obtain loans which prolonged Le-Nature's life which enabled it to incur even more debt, and (2) greatly dissipated any remaining assets of Le-Nature's.  Krones argues that these allegations mirror the definition of "deepening insolvency" as set forth *CitX*, which the Court of Appeals for the Third Circuit rejected as a measure of damages.

In *Lafferty, supra*., the Court described "deepening insolvency" as a type of "injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life."  267 F.3d at 347.  The *Lafferty* Court predicted that "where 'deepening insolvency' causes damage to corporate property," the Pennsylvania Supreme Court "would provide a remedy by recognizing" a deepening insolvency cause of action.  *Id.* at 351.  In *CitX*, decided five years after

*Lafferty*, the Court of Appeals clarified that, although *Lafferty* recognized deepening insolvency as a valid cause of action in Pennsylvania, it "never held that it was a valid theory of damages for an independent cause of action." *CitX*, 448 F.3d at 677; *see also, id.* ("Those statements in *Lafferty* were in the context of a deepening-insolvency *cause of action*. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice."). The *CitX* court further held that although *Lafferty* approved deepening insolvency as a tort for fraudulent conduct, allegations of negligence could not support a deepening-insolvency claim. *CitX*, 448 F.3d at 680-81.

Although the *CitX* Court held that deepening insolvency is not an independent form of damages, it made clear that:

> Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation.

*Id.* at 678 (quoting Sabin Willett, <u>The Shallows of Deepening Insolvency</u>, 60 Bus. Law. 549, 575 (2005)). In other words, traditional damages stemming from a given cause of action "do not become invalid merely because they have the effect of increasing a corporation's insolvency." *Thabault v. Chait*, 541 F.3d 512, 523 (3d Cir. 2008); *see also AHERF I, supra.,* 2007 WL 141059, at *7.

Here, Krones seeks dismissal of all of Kirschner's claims against it because, according to Krones, Kirschner's complaint describes damages based on a deepening insolvency measure, which *CitX* precludes him from recovering. I disagree that Kirschner's complaint seeks damages based on a deepening insolvency measure.

First, Kirschner clearly states in his opposition brief, that his complaint does not assert an independent "deepening insolvency" claim, and based on my review of the complaint, I concur.

Indeed, the term "deepening insolvency" does not appear anywhere in the complaint. In addition, Kirschner states in his opposition brief that he is not seeking deepening insolvency damages for any of his claims. Moreover, as explained above, *CitX* does <u>not</u> preclude an otherwise available recovery where a complaint asserts a cause of action that provides for a remedy for increased liabilities, decreased fair asset value, or lost profits. 448 F.3d at 678. To the contrary, if available under applicable law, damages for an increase in a corporation's liabilities, decrease in its fair asset value, or lost profits, all remain available regardless of the impact on the solvency calculation.

Although the Complaint refers to the "artificial prolongation of [the] failed and insolvent enterprise," it also alleges in detail Krones' participation in the embezzlement scheme, and Krones' purported wrongful conduct which caused an increase in Le-Nature's liabilities. See ¶¶ 135-141 of Kirschner's complaint. Krones does not argue that such damages are unavailable under Kirschner's common law or RICO claims. Moreover, as *CitX* and *Thabault* make clear, such damages do not become unavailable simply because the alleged increase in liabilities may have had the effect of deepening Le-Nature's insolvency. Accordingly, Krones' motion to dismiss Kirschner's claims on deepening insolvency grounds is denied. *See, e.g.*, *AHERF I*, 2007 WL 141059, at *7 (denying motion for summary judgment where complaint alleged "independent causes of action in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a 'remedy for the increase in its liabilities, the decrease in fair market value, or its lost profits.'").

### b. Proximate Cause

Krones argues that Podlucky's waste and embezzlement of funds was the sole, proximate cause of any injury Le-Nature's may have incurred. Krones suggests this case is akin to *CitX* in that

Le-Nature's insolvency did not deepen because Le-Nature's  incurred new debt, but by the fact that Podlucky and the insiders squandered the loan proceeds and/or looted the assets.[13]  According to Krones, because Kirschner fails to allege that Krones knew about, participated in, or should have reasonably foreseen that Podlucky would embezzle the loan proceeds, Kirschner has failed to explain how Krones proximately caused any harm that befell Le-Nature's.  Kirschner responds by stating that he has pled that Krones' conduct constituted a substantial factor in bringing about Le-Nature's harm, and thus, it proximately caused Le-Nature's injury.

As noted by the Court of Appeals for the Third Circuit in the multidistrict litigation matter, *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781 (3d Cir. 1999), "whether plaintiffs have adequately alleged causation depends greatly on the particulars of the state law governing each claim." *Id.* at 794.  Accordingly, I must apply Pennsylvania law to the instant matter.

I note at the outset that most of the law cited by Krones in support of its position hails from district courts outside of Pennsylvania with the exception of *Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281 (Pa. Super. 2005). In *Lux*, the Pennsylvania Superior Court held:

> "Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." *Dudley v. USX Corp*., 414 Pa.Super. 160, 606 A.2d 916, 923 (1992) (citations omitted). Proximate cause does not exist where the causal chain of events resulting in plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm. *Id.*, 606 A.2d at 923.

*Lux,* 887 A.2d at 1286-1287.

---

[13] As discussed above, I do not find that Kirschner's complaint asserts a deepening insolvency cause of action nor does it seek damages based on deepening insolvency.  Rather, the common law and RICO claims raised in the complaint seek "traditional" damages such as increased liabilities, the decreased fair market value of assets and possibly lost profits. My opinion on the deepening insolvency matter does not affect my analysis of whether Kirschner's complaint has adequately pled facts that could support a finding of proximate cause between Krones' actions (or inactions) and Le-Nature's alleged harm (*i.e.* increased liabilities, decreased fair market value of the assets and possibly lost profits).

Kirschner's complaint sets forth allegations claiming Krones agreed to "refund deposits" to Le-Nature's that Le-Nature's never made. (See complaint, ¶ 11). The complaint also alleges that Podlucky and the Insiders fraudulently inflated prices on bottling line equipment so when the equipment financiers paid Krones more than was needed to manufacture the equipment, Krones sent the "excess payments" to Le-Nature's. (See complaint, ¶ 13). The complaint also alleges that when an informant threatened to reveal this refund and excess payment scheme, Krones and Podlucky "worked together to actively conceal this part of the Fraudulent Scheme" by fabricating equipment schedules which supported the higher, fraudulent prices and by providing "excuses" why the financing seemed to be more than the equipment costs. (*Id*. and ¶ 141). According to the complaint, this part of the overall Ponzi scheme garnered $118 million and constituted more than 50 percent of all the funds the equipment financiers provided. (See complaint, ¶ 131). Kirschner's complaint suggests that Krones' involvement was integral to this part of the scam. (See complaint, ¶¶ 131-143).

Based on the facts as plead by Kirschner, Krones (and the other defendants) fall squarely within the causal chain of events resulting in Le-Nature's alleged injuries. Krones' involvement is not so remote so as to appear "highly extraordinary." To the contrary, the conduct, as pled, could have brought about the harm allegedly sustained by Le-Nature's. Kirschner has adequately pled facts which illustrate Krones' alleged wrongful acts, Krones' knowledge that its acts would further a fraud, and nevertheless, willingly participated in the fraud. Kirschner has also alleged that Krones' conduct caused Le-Nature's to sustain an additional $118 million in liabilities since Krones knew or should have known that this money was not needed for equipment purchases. Accordingly, I find Krones' actions and inactions (as pled) to be a substantial factor contributing to Le-Nature's alleged injuries. For these reasons, I decline to dismiss the complaint against Krones for failure to adequately

plead proximate cause.

### c. Timing of Le-Nature's Insolvency

Krones suggests that because Kirschner pled that Le-Nature's was insolvent in January of 2003, before the alleged Ponzi scheme began, Kirschner cannot show how Le-Nature's sustained any damages because of the alleged Ponzi scheme. Stated another way, since Le-Nature's was insolvent before the Ponzi scheme started, Le-Nature's shareholders were entitled to zero; thus, even if the Ponzi scheme increased Le-Nature's liabilities and debts, the shareholders were in no worse position because of the Ponzi scheme than they were in January of 2003. Krones suggests that the only "persons" in a worse position are Le-Nature's creditors, whose interests are not represented by Kirschner. In response, Kirschner relies on *Lafferty, supra*. Again, I concur with Kirschner.

In *Lafferty* the Court offered examples of how an insolvent corporate entity such as Le-Nature's could be injured by incurring additional debt post insolvency:

> . . . insolvency is a financial condition in which a corporation's debts exceed the fair market value of its assets. 11 U.S.C. § 101(32). Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs . . . [B]ankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner.

*Lafferty*, 267 F.3d at 349.

In the instant matter, because the bankruptcy occurred post-Ponzi scheme, post-insolvency, and was foisted on Le-Nature's involuntarily by its creditors, and given the example set forth in *Lafferty*, I decline to dismiss the complaint against Krones on the basis that Le-Nature's insolvency predated the Ponzi scheme.

### 3. The Krones Defendants' "Inadequately Pleaded Claims" Argument

#### a. Federal Rule of Civil Procedure 9(b)

Rule 9(b) requires particularity when pleading fraud. *See Marangos v. Swett* Civ. No. 8-4146, 2009 WL 1803264 at * 3 (3d Cir. June 25, 2009). Specifically, Rule 9(b) provides that:

> [i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which the defendants are charged" in order to allow them the opportunity to respond to the complaint "and to prevent false or unsubstantiated charges." *Rolo v. City of Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998), *citing, Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984).

Thus, to satisfy Rule 9(b), Kirschner must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo*, 155 F.3d at 658. Kirschner need not "plead the 'date, place or time' of the fraud, so long as [he] use[s] an alternative means of injecting precision and some measure of substantiation into [his] allegations of fraud." *Id., citing, Seville*, 742 F.2d at 791. The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. *Ibid.* Further, I am cognizant that, where a party alleges a complex corporate fraud, much of the factual information necessary to describe the details of the fraud may be "peculiarly within the defendant's knowledge and control." *See Kaiser Foundation Health Plan, Inc. v. Medquist, Inc.*, Civ. No. 8-4376, 2009 WL 961426 at * 6 (D. N.J. April 8, 2009), *citing, In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989) and *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284 (3d Cir. 1992).

Krones argues that Kirschner essentially lumps all of the Krones Defendants together and complains that this impermissible under Rule 9(b).  Specifically, Krones notes that Kirschner's complaint fails to identify with any particularity which of the four Krones' Defendants made specific misrepresentations and fails to identify to whom required disclosures should have been made. Finally, Krones argues that the time frame for the alleged fraudulent acts fails to satisfy Rule 9(b) since the allegations span from 2004 to 2006 and are therefore "absurdly broad."

Having carefully reviewed the complaint, I find Krones' arguments to lack merit.  Certainly, there are some allegations in the complaint which provide general background information on the nature and goals of the alleged scheme and which do not delineate between the actions of particular Defendants. (See complaint, ¶¶ 2, 5 and 11-15).  Tellingly, these paragraphs are all located in the "Preliminary Statement" section of the complaint.  Had Kirschner included nothing more detailed as to each individual Krones Defendants' alleged role, I would be inclined to agree with Krones that the complaint was deficient. *See, Silverstein v. Percudani*, 422 F. Supp.2d 468, 472-73 (M.D. Pa. 2006) (stating, "[a] complaint that 'lumps' together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations").

However, Kirschner can and did meet his Rule 9(b) obligations by providing Krones with notice of the "precise misconduct" with which the Krones Defendants are charged, and he accomplished this by "injecting precision and some measure of substantiation" into his fraud allegations.  Generally, the complaint asserts that the misconduct involves Defendant Kronseder[14]

---

[14] As discussed below, this Court cannot exercise *in personam* jurisdiction over Kronseder.  Consequently, any ruling pertaining to the sufficiency of the pleadings pursuant to Rule 9(b) does not apply to claims asserted against Kronseder in his personal capacity.

(on behalf of Krones AG and possibly Krones, Inc.)[15], and Defendant Sommer (individually and on behalf of Krones, Inc.), as well as the actions of others in the Krones, Inc. or Krones AG employ working with Podlucky to falsify costs of equipment and show fictitious deposits for the equipment.

Specifically, Kirschner's complaint alleges that Podlucky and another, unrelated Defendant, ("Pollinger" – through its principals D.K. and P. Pollinger), inflated the cost of the equipment needed to expand the Latrobe, Pennsylvania facility. (See complaint ¶¶ 133-134). When financiers "overpaid" for the equipment, Pollinger sent the "excess payments" to Le-Nature's, which in turn, looked to "balance its books" by having Podlucky record forged statements for a bank account in Le-Nature's name, fictitious deposits to Pollinger for bottling equipment. (See complaint ¶¶ 134-135). In 2004, Le-Nature's "Real World" accounting system reflected that Le-Nature's had made $100 million in fictitious deposits to Pollinger, and by 2005, these fictitious deposits totaled $163 million. (See complaint ¶¶ 136-137). Over time, these fictitious deposits were "transferred" to Krones, because it was manufacturing most of the equipment for both the Latrobe, Pennsylvania and the Phoenix, Arizona plants, and at various points in time, Krones was shown as holding $140 million in phony deposits. (See complaint ¶ 138).

Kirschner's complaint explains that Krones AG actually manufactured equipment, but "Krones" acting through it principals and executives (including Kronseder and Sommer) agreed to inflate the cost of the manufactured equipment purchased by Le-Nature's and place these inflated costs on the invoices and schedules which were provided to Le-Nature's equipment financiers. (See complaint ¶¶ 139, 142). According to the complaint Defendant Kronseder, Defendant Sommer, and

---

[15] As the titular heads of Krones, Inc. and Krones AG, and because no argument has been raised to the contrary, I view the allegations against Sommer and Kronseder to constitute allegations against them both in their individual and corporate capacities.

"other officers of Krones" were contacted by an informant – who had been employed by or affiliated with "Krones" – who revealed the purported cost of the Phoenix plant equipment was inflated by as much as $90 million.  (See complaint ¶ 140-141).  Despite this information, Kirschner alleges that Kronseder and Sommer worked with Podlucky to continue to fabricate equipment schedules which supported the higher, fraudulent equipment prices. (See complaint ¶ 141).  Finally, the complaint alleges that when confronted with information that a whistleblower was passing around the true equipment costs, Sommer and Kronseder actively participated, substantially assisted or knowingly failed to stop Krones, Podlucky and the Insiders from continuing to use false costs.  (See complaint ¶ 142).

Based on these allegations, I find that Kirschner has met the purpose of Rule 9(b) by providing notice of the precise misconduct at issue with respect to the Krones Defendants and the allegations set forth in the complaint have been pled with the requisite sufficiency so as to enable Krones to respond to the complaint and to prevent false or unsubstantiated charges.

### b. RICO Claims

Krones next suggests that Kirschner's complaint deficiently pled all of the RICO claims because he failed to provide a "fuller set of factual allegations" as required by *Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) and *Limestone Development  Corp. v. Village of Lemont, Illinois*, 520 F.3d 797 (7th Cir. 2008).   Krones argues that Kirschner needed to allege facts suggesting how each of the Krones Defendants generally engaged in: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering, and specifically argues that the complaint fails to identify any predicate acts taken by any one of the Krones Defendants so as to create a "pattern" of racketeering activity.

First, I note that *Ashcroft v. Iqbal*, *supra*, controls the depth of detail with which these claims must be pled in order to survive a motion to dismiss. As stated above, if the complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face – meaning the plaintiff has pled factual content enabling this court to draw the reasonable inference that the defendant is liable for the misconduct alleged – the motion to dismiss must be denied. *Iqbal*, 129 S.Ct. at1949.  Moreover, the Court of Appeals for the Third Circuit recently applied the *Iqbal* stanard in *Fowler v. UPMC Shadyside*, ___ F.3d ___ (3d Cir. 2009), 2009 WL 2501662, and offers this guidance with respect to "plausibility":

> . . . a plaintiff is not required to establish the elements of a *prima facie* case but instead, need only put forth allegations that "raise a reasonable expectation that discovery will reveal evidence of the necessary element." . . . Under the Federal Rules of Civil Procedure, an evidentiary standard is not a proper measure of whether a complaint fails to state a claim.

*Fowler,* 2009 WL 2501662, at *7 (citations omitted).

I am guided by *Iqbal* and *Fowler* as I turn to Kirschners' complaint to assess whether it sufficiently alleges at least two predicate acts of racketeering, (which may include mail fraud), under 18 U.S.C. § 1341. *See, Lum v. Bank of America,* 361 F.3d 217, 223. (3d Cir. 2004), *cert den.* 543 U.S. 918, 125 S.Ct. 271 (Oct 4, 2004).  The *Lum* Court noted that, "[a] scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Ibid.*

In this case, Kirschner has asserted that Krones (through Krones, Inc.'s CEO, Defendant Sommer, and through Krones AG's majority shareholder, Defendant Kronseder), wired "excess payments" (meaning the overpayments for the equipment) to Le-Nature's on fourteen separate dates. (See complaint at ¶ 215(c)).  Kirschner's descriptions of these wire transfers clearly constitute mail

fraud, and when read in connection with the remainder of the complaint, (specifically the paragraphs referenced in this opinion at "3.a.," above), adequately set forth a scheme of fraudulent misrepresentations which were reasonably calculated to deceive persons of ordinary prudence and comprehension (*i.e.* the alleged minority preferred shareholders, financiers and possibly others).

Next, Krones argues Kirschner's complaint fails to adequately allege that Krones was part of a conspiracy under RICO section 1962(d) because Kirschner failed to show an underlying violation of section 1962(c).  Because I have determined that the complaint adequately pleads Krones' alleged violation of section 1962(c), and given the facts set forth in Kirschner's complaint as highlighted in section "3. a." of my opinion, above, Kirschner has clearly met the requisite standard under *Iqbal* and *Fowler* of showing Krones' intent to conspire with other Defendants to commit the fraud alleged. (See complaint ¶¶ 133- 142, 215).

Krones next suggests that Kirschner failed to properly plead a RICO enterprise.  Under RICO, an enterprise includes "any individual, partnership, corporation, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).  "RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.' " *Boyle v. United States*, __ U.S. __, 129 S.Ct. 2237, 2243 (June 8, 2009), *citing Turkette,* 452 U.S. at 583.  "An enterprise 'is <u>proved</u> by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' " *Ibid.*

Again, since this is the pleading stage and not trial, *Iqbal* and its progeny, (specifically *Fowler, supra.*), control what Kirschner must do at this stage.  He is not required to "prove" the

existence of an enterprise, but rather, must provide enough factual content so that I can draw a reasonable inference that it is plausible that Krones was part of an enterprise and thus liable for the misconduct alleged under RICO. Again, given the facts set forth in Kirschner's complaint as outlined in section "3. a." of my opinion, above, Kirschner has clearly met the requisite standard under *Iqbal* and *Fowler.*

Finally, Krones argues that Kirschner failed to allege that the Krones Defendants agreed to further or facilitate the criminal endeavor and share in the "common purpose" of the endeavor. Krones suggests that Kirschner's sole conclusory paragraph (¶ 223) fails to meet the plausibility standard of *Bell Atlantic Co. v. Twombly, supra*. If this were the only paragraph that discussed Krones' actions, I would agree with Krones. However, I find that the paragraphs discussed in detail in section "3.a." above (¶¶ 133-142) provide enough factual information to deem it plausible that Defendants Krones AG and Krones Inc., through Defendants Sommer and Kronseder, furthered the criminal endeavor (*i.e.* Krones' participation in crafting equipment schedules and invoices to help Podlucky and Pollinger justify the over-priced equipment so Le-Nature's could obtain excess payments, transferring the "excess payments" to Le-Nature's for the overpriced equipment, accepting Le-Nature's fictitious deposits from Pollinger, and entering into written agreements with Le-Nature's to achieve all of these goals).

Accordingly, based in part on my opinion set forth above in section "3. a." above, and the law set forth here, I find that Kirschner has adequately pled facts to state a claim for relief from which I can draw a reasonable inference that Krones could be liable for the misconduct alleged. As such, I decline to grant Krones' motion to dismiss the RICO claims.

**c. Aiding and Abetting Claims**

Krones next argues that Kirschner's claims for aiding and abetting both fraud and breach of fiduciary duty must be dismissed because they are not cognizable claims under Pennsylvania law. Pertinent here, the Restatement (Second) Torts § 876(b), on which Plaintiff relies, has not been expressly adopted by the Pennsylvania Supreme Court.  *See, e.g., Clayton v. McCullough*, 448 Pa. Super. 126, 670 A.2d 710, 713 (1996).

> That Section reads, in its entirety, as follows:
>
> § 876 Persons Acting in Concert
>
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) Torts § 876(b).

When state law issues arise that remain unaddressed by the highest court in the state, a federal court must predict how that court would rule. *Berrier v. Simplicity Mfg.*, 563 F.3d 38, 45-46 (3d Cir. 2009).  In doing so, I may consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 663 (3d Cir. 1980). In making that prediction, "a federal court can . . . give due regard, but not conclusive effect, to the decisional law of lower state courts."  *Nationwide Mut. Ins. Co. v.*

*Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000) (citation omitted).  Moreover, I am not to disregard the opinions of intermediate appellate courts, unless persuasive data convinces me that the Pennsylvania Supreme Court would decide to the contrary.  *Id.*

On this issue, I reach the same conclusion as that in *Gilliland v. Hergert*, No. 2:05-cv-01059, 2007 U.S. Dist. LEXIS 84508 (W.D. Pa. Nov. 15, 2007), and *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 317 (E.D. Pa. 2007), both of which predicted that the Supreme Court of Pennsylvania would recognize § 876(b).[16]  I am persuaded by the thorough analyses set forth in those cases.  I note, too, that Defendant has not pointed to – nor have I found -- language in any Pennsylvania State Court opinion that criticizes or otherwise undermines the principles underlying or stated in § 876(b).   In other words, there is no persuasive data to convince me to decide contrary to the Pennsylvania caselaw on which both *Gilliland* and *Lexington & Concord* relied. Therefore, I decline to dismiss Kirschner's claims against Krones for aiding and abetting fraud and aiding and abetting the breach of fiduciary duty.

### 4. Personal Jurisdiction Argument

Krones asserts federal and Pennsylvania state law claims against Defendant Kronseder.  Kronseder counters that this Court lacks the requisite personal jurisdiction over him necessary to entertain these claims.  Accordingly, he demands the dismissal of all claims asserted against him under F.R.Civ.P. 12(b)(2).

"'Because federal courts are courts of limited jurisdiction, a presumption arises that they are

---

[16] Kirschner relies on *Skipworth v. Lead Indus. Association*, 547 Pa. 224, 690 A.2d 169 (1997) in which the Pennsylvania Supreme Court adopted the principle that a "concert of action" claim under Restatement (2d) § 876(a) cannot lie if plaintiff cannot identify the wrongdoer or the person who acted in concert therewith.   Although the *Skipworth* decision only discussed § 876(a), most Pennsylvania courts subsequently considering that decision have <u>not</u> limited the application of §876 to subsection (a).

without jurisdiction until the contrary affirmatively appears.'" *Donaldson v. Informatica Corp.*, Civ. No. 8-605, 2009 WL 483087 at * 7 (W.D. Pa. Feb. 25, 2009), *citing, Myers v. American Dental Ass'n,* 695 F.2d 716, 724 (3d Cir. 1982). "'The person asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of the litigation." *Donaldson*, 2009 WL 483087 at * 7, *citing, Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993). In other words, "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Cateret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). "When a defendant challenges personal jurisdiction, the plaintiff has the burden of proof to establish 'jurisdictional facts through sworn affidavits or other competent evidence.' *Regan v. Loewenstein,* 292 Fed. Appx. 200, (3d Cir. 2008), quoting *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir.1990).[17]

Kirschner thus bears the burden of proving the existence of personal jurisdiction.  Further, because Kirschner initiated this action in Pennsylvania, before it was transferred here pursuant to 28 U.S.C. § 1407, the jurisdictional queries must be answered with respect to the Commonwealth of Pennsylvania.  Consequently, I may only exercise personal jurisdiction over Kronseder to the same extent that Pennsylvania could have. *See, In re Latex Gloves Products Liability Litigation*, 2001 WL 964105 at * 2 (E.D. Pa. Aug. 22, 2001), *citing, Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 (3d Cir.1998).  Pennsylvania's long-arm rule permits the exercise of personal

---

[17] "For purposes of a Rule 12(b)(2) motion, the court applies the same standard for truthfulness and inferences as in a Rule 12(b)(6) motion, that is, accepting as true plaintiff's version of the facts and drawing all inferences in the plaintiff's favor." *Marten v. Godwin*, 499 F.3d 290, 295 n. 2 (3d Cir. 2007).

jurisdiction to the extent allowed by the due process clause of the United States Constitution. 42 Pa.C.S.A. § 5322(b).[18]

The Due Process Clause permits courts to exercise two types of personal jurisdiction over a defendant – general and specific. *See, Mellon Bank (East) PSFS, Nat'l Assn. v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). General jurisdiction is the broader of the two types, and is supported where a defendant has maintained "systematic and continuous" contacts with the forum state. *See, Donaldson*, 2009 WL 483087 at * 7, *citing, Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). The contacts need not be related to the particular claim proceeding in court. Thus, "[i]f a party is subject to the general jurisdiction of a state, that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum." *Mellon Bank*, 960 F.2d at 1221. "In contrast, specific jurisdiction is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant " 'should reasonably anticipate being haled into court' " in that forum." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (internal citations omitted). Specific jurisdiction is a narrower grant of jurisdiction.

Kronseder has tendered a Declaration which would defeat any effort to establish the exercise of general jurisdiction.[19]   Accordingly, Kirschner focuses its argument solely upon specific

---

[18]As referenced above, Kirschner asserts both state and federal claims. Kirschner makes no argument that the federal RICO claims permit a *nationwide* minimum contacts analysis. Such an argument would not be persuasive in any event given that the RICO statute does not authorize such service over international defendants. *See, General Environmental Science Corp. v. Horsfall*, 25 F.3d 1048 (6th Cir. May 25, 1994) (table) text in 1994 WL 228256, *7, n. 12., *citing, Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 817 F.Supp. 326, 331-32 (E.D.N.Y.1993).

[19] For example, Kronseder explains that he resides in Germany, and has never lived in, owned real estate in, or paid taxes to Pennsylvania. He has never had bank accounts in Pennsylvania, never applied for a license, contracted to provide services or things in Pennsylvania, nor visited Le-Nature's in Pennsylvania nor being "present for the negotiations with Le-Nature's that took place in Pennsylvania." See Docket No. [87-2]. In light of this

jurisdiction.  It utilizes two different methods to establish specific jurisdiction – the more traditional minimum contacts method and the alternative "effects" test under *Calder v. Jones*, 104 S.Ct. 1482, 465 U.S. 783, 79 L.Ed.2d 804 (1984).  After careful consideration, I reject Kirschner's contentions that the evidence of record currently establishes that the exercise of specific jurisdiction would be appropriate here.

### a. Traditional Inquiry

"Traditionally, determining whether specific jurisdiction exists over a non-resident defendant involves a three part inquiry." *Donaldson*, 2009 WL 483087 at * 8 *citing*, *Marten*, 499 F.3d at 296. Kirschner must show: (1) that Kronseder "'purposefully directed'" his activities at Pennsylvania; (2) that the claim "'arise[s] out of or relates to' at least one of those specific activities"; and (3) that the exercise of jurisdiction comports with "fair play and substantial justice." *Id*.  Kirschner fails to satisfy the first of the inquiries.

As "evidence" that Kronseder purposefully directed his activities toward Pennsylvania, Kirschner offers the following: (1) Kronseder's conduct, even if outside of Pennsylvania caused harm in Pennsylvania; and (2) Kronseder caused 15 wire transfers of the fraudulent excess payments to be made in the Commonwealth of Pennsylvania.  (See complaint, ¶¶ 13, 138, 140-142, 152-159). In further support of his proposition that Kronseder was personally involved with the wire transfers, Kirschner supplied the declaration of D. Ray Strong, Kirschner's consultant retained to analyze and investigate the financial transactions of Le-Natures. This declaration which attached copies of each wire transfer references transfers from Krones Inc. (not Kronseder personally or even Krones AG)

---

uncontradicted evidence, Kronseder can hardly be said to have had "systematic and continuous" contacts with Pennsylvania.

to Le-Natures.

The Supreme Court has made it clear that even a single contact can be sufficient to demonstrate that a defendant purposefully established contacts with a forum state. *See, McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957).  Yet, "[t]he test has always focused on the 'nature and quality' of the contacts with the forum and not the quantity of those contacts." *Zippo Manufacturing Company v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1127 (W.D. Pa. 1997), *citing, International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S. Ct. 154, 160 (1945).  Here, the "nature and quality" of the contacts – 15 wire transfers that occurred between Krones Inc. and Le-Nature's – does not convince me that Kronseder purposefully established contacts with Pennsylvania.  The cases cited by Kirschner reference situations where there appears to have been direct contact between the foreign individual and the mode of communication that occurred in the forum state.  In this case the connections between Kronseder appears tenuous at best and thus,  I decline to find that Kronseder purposefully directed his activities toward Pennsylvania based upon this paucity of evidence.

### b. Effects Test

In *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984), the Supreme Court announced an alternative means of establishing personal jurisdiction in intentional tort cases.  Commonly referred to as the "effects test," Kirschner may establish specific jurisdiction over Krones, a non-resident defendant, if he demonstrates:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).  Where a plaintiff establishes these three elements, he "can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone ... are far too small to comport with the requirements of due process under [the] traditional analysis." *Martin*, 499 F.3d at 297, *citing*, *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (internal quotation marks omitted).  Nevertheless, the effects test "prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state <u>if the defendant did not expressly aim his conduct at that state</u>." *Id* (emphasis added).

Turning to the third inquiry, as above, the evidence before me does not establish that Kronseder "expressly aimed" his conduct at Pennsylvania.  The evidence consists of wire transfers made by Krones Inc. (not Kronseder or even Krones AG) to Le-Nature's. Consequently, the exercise of personal jurisdiction under the "effects test" is similarly unwarranted.

### c. Jurisdictional Discovery

In lieu of dismissing the claims against Kronseder, Kirschner requested leave to conduct jurisdictional discovery.  "[W]here the plaintiff's claim is not clearly frivolous, the court should ordinarily allow jurisdictional discovery in order to aid the plaintiff" in his attempt to establish jurisdiction. *See, Reading v. Sandals Resorts Int'l. Ltd.*, Civ. No. 6-3511, 2007 WL 952031 at * 3 (D. N.J. March 28, 2007), *citing*, *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983) and *Massachusetts School of Law of Ander, Inc. v. American Bar Ass'n.*, 107 F.3d 1026, 1042 (3d Cir. 1997) (holding that the general rule is that jurisdictional discovery should be allowed unless the plaintiff's claim is "clearly frivolous").  Thus, "[i]f a plaintiff can present factual allegations that suggest 'with a reasonable particularity' the

possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff should have a right to conduct jurisdictional discovery." *Reading*, 2007 WL 952031 at * 3, *citing*, *Toys "R" Us, Inc. v. Step Two S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) and *Mellon Bank (East) PSFS, Nat. Ass'n. v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). However, "jurisdictional discovery generally relates to corporate defendants and the question of whether they are 'doing business' in the state." *Massachusetts School of Law*, 107 F.3d at 1042, *citing*, *Compagnie Des Bauxites*, 723 F.3d at 362. "'Where the defendant is an individual, the presumption in favor of discovery is reduced." Id., *citing*, *Shaw v. Boyd*, 658 F. Supp. 89, 91 n. 1 (E.D. Pa. 1987).

I recognize that Kronseder is an individual and the presumption in favor of discovery is thus reduced in this instance. Nevertheless, given the circumstances of this case, I am inclined to permit limited jurisdictional discovery. While Kronseder's declaration refutes the possibility that general jurisdiction would exist in this case, the declaration does not negate the possibility that specific jurisdiction might arise. Clearly, Kronseder is involved with Krones AG, which in turn has some relationship to Krones, Inc. (which may give rise to Kronseder, as an individual, also having an independent relationship with Krones, Inc.). Further, it appears at this juncture that at least some of bottling equipment manufactured by Krones AG and sold to LeNature's through Krones, Inc. was supplied to the Latrobe, Pennsylvania facility. Kronseder's specific role and/or duties in this sale may prove to support the exercise of personal jurisdiction. Consequently, I will permit Kirschner to engage in limited discovery in this regard.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:  Le-Nature's Inc.                    MDL Docket no. 2021
                                            WDPA Docket no. 2:09-mc-00162


Marc S. Kirschner, solely in his capacity as        )
the Liquidation Trustee of the Le-Nature's          )
Liquidation Trust,                                  )   Civil Action No. 08-1518
                                                    )
                          Plaintiff,                )
            vs.                                     )
                                                    )
Wachovia Captial Markets, LLC, et al.,              )
                          Defendants.               )


AMBROSE, Chief District Judge


### ORDER

        AND now, this 16th day of September, 2009, upon consideration of the Motion to Dismiss

filed by Defendants, Krones AG, Krones Inc., Heinz Sommer, and Dr. Volker Kronseder (Docket

No. 85 at 8-cv-1518 and Docket No. 62 at 9-mc-162), it is ordered that said Motion is denied.

However, limited discovery for a period of sixty days as to Defendant Dr. Volker Kronseder's

specific role and/or duties for the purpose of ascertaining personal jurisdiction will be permitted.

Discovery on this topic only will be completed on or before November 18, 2009.

                                  BY THE COURT:

                                  s/  Donetta  W.  Ambrose
                                      Donetta W. Ambrose,
                                      Chief U.S. District Judge